**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NICHOLAS ZALDASTANI, an individual, CHEN JOINT REVOCABLE TRUST, a trust, XIANG MING CHEN, an individual, KEVIN PHILLIPS, an individual, LU & LI TRUST, a trust, SALMAN AZHAR, an individual, KRISTIN SPINDLER, an individual, THOMAS ESPY, an individual, FRENCH ROAD, LLC, a limited liability company, SAND HILL PRIVATE INVESTMENTS, LLC, a limited liability company, VICTORIA DAUPHINOT, an individual, and DAVID MARTIN, an individual. | C. A. No. |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| BRAINTAP, INC., a Delaware corporation as a direct Defendant, BRAINTAIP, INC., as a nominal Defendant, PATRICK PORTER, an individual; and CYNTHIA PORTER, an individual, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Nicholas Zaldastani, Chen Joint Revocable Trust, Xiang Ming Chen, Kevin Phillips, Lu & Li Trust, Salman Azhar, Kristin Spindler, Thomas Espy, French Road, LLC, Sand Hill Private Investments, LLC, Victoria Dauphinot, and David Martin (collectively, "Plaintiffs"), allege and claim against Defendants BrainTap, Inc. (the "Company"), as both a direct Defendant and a nominal Defendant, Patrick Porter, and Cynthia Porter (collectively, "Defendants") as follows:

### **SUMMARY**

1.      BrainTap, Inc. purports to offer non-invasive, drug-free technology-enabled therapies to help users improve mental clarity, reduce stress and anxiety, and help with conditions such as insomnia, chronic pain, PTSD, and addiction. Based upon the promise that the Company held to help people improve their mental health and the representations that the founders pioneered much of this technology, Plaintiffs invested millions of dollars into the Company, and in some cases joined the

team. The founders of the Company lured Plaintiffs using various promises, including, among other things, that the Company wished to transform from a "mom & pop" operation to a professional venture-backed company for exit in 2-4 years, that it would employ the best business, financial, and accounting practices, and that it owned free and clear or licensed all intellectual property rights needed to operate its business.

2.      Despite the initial rapid growth under a professional Chief Executive Officer ("CEO"), the original husband-and-wife founders continued to operate the Company as their own personal and family "ATM," extracting millions of dollars of corporate assets for the benefit of themselves and their family members, and they proposed or attempted schemes that bordered on or constituted illegality. When the professional CEO and outside legal and accounting firms tried to stop these actions, the husband-and-wife founders fired the CEO and the outside professionals, leaving a clear path for their wrongdoing. As a result, the technology suffered and the Company's value plummeted.

3.      Plaintiffs constitute a majority of the outstanding disinterested stock of the Company. They bring direct claims against the Company and the founders, including securities fraud, as well as derivative claims against the founders, including for breach of fiduciary duties. Plaintiff Nicholas Zaldastani, in addition to being the largest stockholder outside of the founders, is also the former CEO. He brings individual claims related to the fraud, defamation, breaches of contract, and other wrongs committed against him.

4.      Angel and startup investing is critical to the economic lifeblood of the United States as technology-enabled companies represent most of the growth in the U.S. economy and one of its remaining durable advantages. One of the greatest barriers to the continued growth of this sector is the endemic fraud committed against angel and early-stage venture investors, which almost always occurs without consequence. This action is brought by a group of successful and seasoned angel and venture investors to hold accountable those responsible for securities fraud and breaches of fiduciary duty in the startup world.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Sections 10(b) of the Securities Exchange Act ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.

6.      This Court has jurisdiction over each Defendant because Defendant BrainTap, Inc. is incorporated in Delaware and Defendants Patrick Porter and Cynthia Porter are both officers and directors of this Delaware corporation. Each Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      This Court further has jurisdiction over Defendants because the key financing documents require that Delaware law shall apply to all disputes and further agreed to submit to the jurisdiction of this Court in the primary contracts at issue.

8.      For example, the BrainTap, Inc. Series A Preferred Stock Purchase Agreement ("Series A SPA") in Section 6.3 states that "This Agreement shall be governed by the internal law of the State of Delaware without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware." Section 6.13 states that "The parties … hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Delaware and to the jurisdiction of the United States District Court for the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement." Equivalent provisions exist in other relevant agreements, including the Investor Rights Agreement, Right of First Refusal and Co-Sale Agreement, and Voting Agreement.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the violation of fiduciary duties owed to BrainTap, Inc. and to its stockholders and investors, occurred in the District. Venue is further proper in this district because the Series A SPA designates venue in this District.

## THE PARTIES

10.     Plaintiff Nicholas Zaldastani is a stockholder of the Company. Mr. Zaldastani owns 2,000,000 shares of Common Stock and 292,093 shares of Series A Preferred Stock, constituting together 12.815% of its fully diluted ownership. Before his wrongful termination, Mr. Zaldastani was also the Chief Executive Officer of the Company and served as a member and Chairman of the Company's Board of Directors (the "Board"). As further alleged below, although Mr. Zaldastani was never properly removed as a Director, the Company has continued to conduct Board meetings and approve actions without his involvement.

11.     Mr. Zaldastani is a successful entrepreneur and venture investor. He graduated with a B.S.E. in Engineering Economics from Duke University and an MBA from Harvard Business School. Among other positions, Mr. Zaldastani served for ten years as a Member of the Engineering Board of Duke University's Pratt School of Engineering. Mr. Zaldastani is noted for his ability to raise capital and grow companies and has a track record as a successful executive. Mr. Zaldastani is one of the leading figures in the biohacking industry. For example, in 2024 he received the inaugural Ambassador of Biohacking Award, given by Dave Aspery, known as the "Father of Biohacking." The award was presented to Mr. Zaldastani based on his ability to grow companies and bring the industry together.

12.     Plaintiff Chen Joint Revocable Trust is a trust which owns 556,248 shares of Series A Preferred Stock of the Company, which constitutes 3.11% of its fully diluted ownership. The trust beneficiary is Xiang Ming (Sam) Chen, whose wife has passed away since the investment. Mr. Chen and his wife invested to support the growth of the wellness industry based upon promises which never materialized.

13.     Plaintiff Xiang Ming Chen individually also owns 554,564 shares of Series A Preferred Stock of the Company, which constitutes 3.101% of its fully diluted ownership. Mr. Chen has a Ph.D. in Nuclear Engineering from the University of California, Berkeley. He is a successful business leader, serving as Director of Global Sourcing at Amphenol Advanced Sensors. He previously held advanced positions at General Electric in their Advanced Sensors, Power and Water,

and Nuclear Energy divisions.

14.     Plaintiff Kevin Phillips owns 456,651 shares of Series A Preferred Stock of the Company, which constitutes 2.553% of its fully diluted ownership. Mr. Phillips is a highly decorated disabled U.S. military veteran who served in the U.S. Air Force, where he helped manage ICBM missile sites and served in the Gulf War in a secret security clearance position. He is currently President of two successful business performance consulting companies. As a survivor of serious military PTSD, Mr. Phillips invested substantially in BrainTap because of the alleged efficacy of its technology to help treat PTSD and sleep disorders and other promises which never materialized.

15.     Plaintiff Lu & Li Trust is a trust which owns 442,172 shares of Series A Preferred Stock of the Company, which constitutes 2.472% of its fully diluted ownership. The trust beneficiary is Hua (Emily) Lu. Ms. Lu has spent her career making medical-related investments, including building 14 medical clinics and a 380-bed cardiovascular hospital in China. Ms. Lu invested in the Company on the basis of many unfulfilled promises, including that BrainTap, Inc. would permit Ms. Lu to promote its products in China.

16.     Plaintiff Salman Azhar owns 88,332 shares of Series A Preferred Stock of the Company, which constitutes 0.494% of its fully diluted ownership. Dr. Azhar has a Ph.D. in Computer Science from Duke University as a James B. Duke Fellow and a B.S. in Mathematics and Physics from Wake Forest University as a Carswell Scholar. He currently is an Executive in Residence and faculty member at Duke University's Fuqua School of Business. He is also a successful angel and venture capital investor, having invested in over 125 startup companies.

17.     Plaintiff Kristin Spindler owns 129,201 shares of Series A Preferred Stock of the Company, which constitutes 0.722% of its fully diluted ownership. Ms. Spindler has both an Ed.D. and MBA from the University of Texas at Austin. She is currently an Assistant Professor at Concordia University, where she leads the university's entrepreneurship program. She is also an angel investor in several startup companies.

18.     Plaintiff Thomas Espy owns 220,841 shares of Series A Preferred Stock of the Company, which constitutes 1.235% of its fully diluted ownership. He is a successful investor and

graduate of Duke University, where he has funded a named scholarship at the Pratt School of Engineering.

19.     Plaintiff French Road, LLC owns 190,452 shares of Series A Preferred Stock of the Company, which constitutes 1.065% of its fully diluted ownership. The beneficiary of this entity is private, but he is a trustee emeritus of a top 10 rated U.S. national university, a Senior Managing Director of one of the world's largest real estate investment companies, and a successful investor in many private companies.

20.     Plaintiff Sand Hill Private Investments, LLC owns 321,679 shares of Series A Preferred Stock of the Company, which constitutes 1.799% of its fully diluted ownership. Its owner, Mark Holmes, holds a B.E. in Electrical Engineering from Brown University, is the CEO of an award-winning cybersecurity company, a private investor in venture capital companies, and a member of the Band of Angels, a prominent Silicon Valley-based early-stage investment group.

21.     Plaintiff Victoria Dauphinot owns 42,718 shares of Series A Preferred Stock of the Company, which constitutes 0.239% of its fully diluted ownership. Ms. Dauphinot has a multi-generational track record of successful investing.

22.     Plaintiff Dr. David Martin invested $25,000 into a SAFE instrument which was promised to convert into Series B Preferred Stock of the Company, but which has failed to do so due to the failures of the Defendants. Dr. Martin has a Doctorate of Chiropractic degree and owns an private chiropractic practice.

23.     The Plaintiffs as a group own a majority of the shares of the Company not owned by Defendants Patrick Porter and Cynthia Porter.

24.     Defendant BrainTap, Inc. is a Delaware corporation and maintains its principal offices in New Bern, North Carolina. BrainTap, Inc. is both a direct and a nominal Defendant.

25.     Defendant Patrick Porter is the Company's CEO, Treasurer, and a member of the Company's Board. Mr. Porter has served as Treasurer and a Director on the Company's Board since the Company's incorporation.

26.     Mr. Porter styles himself "Dr. Porter" to investors, customers, and the public. Because

the Company operates in the field of brain science and routinely makes scientific and medical claims, his usage of "Dr. Porter" creates a potential impression that he has a specialized degree in a scientific or medical field. In fact, Mr. Porter has a Ph.D. in "Counseling Psychology" from Louisiana Baptist University and Theological Seminary, which is unrelated to the scientific neurological and biological brain chemistry claims Mr. Porter routinely makes in his public appearances. This Complaint shall not use the "Doctor" title, as it might mislead the Court as to his professional academic, medical, and scientific credentials.

27.     Defendant Cynthia Porter, the wife of Mr. Porter, is the Company's Chief Marketing Officer, Secretary, and the Chairperson of the Company's Board. Mrs. Porter has served as Secretary and a member of the Company's Board since the Company's incorporation.

28.     Mrs. Porter holds herself out to the public and to prospective and actual investors as having a Ph.D., which could not be verified by the university. The purported Ph.D. is in "Theocentric Counseling" from La Salle University and she appears to have no professional academic credentials in technology, accounting, or business.

29.     During most of the times described in this Complaint, Mr. and Mrs. Porter held two-thirds of the seats on the Company's Board and therefore effectively held absolute control over all major corporate actions of the Company.

## MR. AND MRS. PORTER OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

30.     At all times relevant to this case, the conduct of Mr. and Mrs. Porter was governed by well-recognized rules to protect the stockholders. Because of their positions as officers and directors of the Company and their ability to control its business and corporate affairs, Mr. and Mrs. Porter owed the stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

31.     Mr. and Mrs. Porter were and are required to act in furtherance of the best interests of the stockholders to benefit all stockholders equally and not in furtherance of their personal interest or

benefit.

32.     Each of the Company's directors owes to the stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

33.     Because of their positions of control and authority as directors and officers of the Company, Mr. and Mrs. Porter were able to and did, directly and indirectly, exercise control over the wrongful acts alleged herein.

34.     To discharge their duties, Mr. and Mrs. Porter were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the Porters were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including disseminating truthful and accurate statements to its prospective and actual investors and not engaging in fraud;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform its stockholders as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Maintain accurate books and records of the Company;

- Refrain from using Company assets for their personal gain or the personal gain of their family members;

- Ensure that the Company complied with all legal and contractual obligations with its

stockholders and third parties;

- Investigate fully all allegations of illegality or wrongdoing, even if committed by themselves or their family members, correct such conditions or practices, and take such actions as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.     Mr. and Mrs. Porter have a duty of candor to the stockholders to avoid conflicted, unfair transactions.

36.     As explained below, Mr. and Mrs. Porter knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious damage to the Company. In addition, because of their positions of control and authority, Mr. and Mrs. Porter were able to exercise control over the wrongful acts complained of herein, while enriching themselves at the expense of the Company and its stockholders.

## FACTUAL ALLEGATIONS

### A. Excel Management and the Hiring of Mr. Zaldastani

37.     Until approximately April 2021, Excel Management, LLC ("Excel Management"), a South Dakota limited liability company, operated under the trade name BrainTap. The current BrainTap, Inc. is the successor company to Excel Management, following its conversion into a Delaware C corporation. Both Excel Management and the current Company operated under the trade name BrainTap.

38.     Prior to approximately 2016, Excel Management was owned entirely by the husband-and-wife team of Mr. Patrick Porter and Mrs. Cynthia Porter. The Porters operated Excel Management as a family-owned and operated business. By Mr. Porter's own written admission, BrainTap was a "mom & pop" operation. Mr. and Mrs. Porter had previously filed a personal Chapter 7 bankruptcy, a fact never disclosed to Mr. Zaldastani or investors.

39.     Mr. and Mrs. Porter were unsuccessful in raising professional venture capital

investment. Professional venture capital firms are notoriously reluctant to invest in husband-and-wife teams, which is one of the reasons why Mr. and Mrs. Porter induced Mr. Zaldastani to join as an advisor, then Chairman, and ultimately the CEO of Excel Management. Mr. and Mrs. Porter demonstrated no ability to raise professional equity investment prior to the hiring of Mr. Zaldastani. In fact, Excel Management relied upon harsh, high-interest rate "hard money" loans, which Mr. Zaldastani successfully replaced with professional venture money.

40.     Mr. and Mrs. Porter had numerous discussions with Mr. Zaldastani about using his expertise to modernize the company, fundraise from venture capitalist and angel investors, and grow the company until it could be acquired at a substantial valuation, a valuation Mr. and Mrs. Porter said they wanted to exceed $100 million before his termination from the Company.

41.     However, despite their promises, Mr. and Mrs. Porter never intended to operate BrainTap as a professionally run venture-backed company, but instead desired to continue to operate it as a family "ATM," supporting unqualified family members, funding personal expenses, and violating norms and practices of high-growth venture companies.

42.     Once Mr. Zaldastani raised capital for the Company, Mr. and Mrs. Porter conspired to terminate him and retake control for themselves, including by attempting to revoke his stock ownership through fraud and intimidation.

43.     Mr. Zaldastani served as an advisor to Excel Management beginning in approximately 2015. In 2016, Mr. and Mrs. Porter asked Mr. Zaldastani to join Excel Management as Chairman and a member. Mr. Zaldastani indicated that he would be interested, but required equity ownership. Mr. Zaldastani further stated that he required a significant equity grant. Excel Management lacked the cash resources to pay Mr. Zaldastani anything as a consultant, much less an amount approaching Mr. Zaldastani's market worth.

44.     Mr. and Mrs. Porter initially gave Mr. Zaldastani a 10% ownership stake in Excel Management, which they later increased to 20% in approximately 2017.

45.     On or about May 1, 2016, Mr. Porter provided to Mr. Zaldastani a written offer entitled "Nicholas Zaldastani Goals and Equity Grant." Mr. Porter affixed his signature to this offer

letter. The letter stated that one of Mr. Zaldastani's tasks would be to "move the company from 'mom & pop' status to a thriving company that is positioned for a public offering or is purchased in 5-7 years." A copy of this letter is attached as **Exhibit A**.

46.     Mr. Porter would often later repeat the timeline for an ultimate exit to investors as "2-4 years." Investors relied upon these statements when making investment decisions and evaluating the risk versus upside of their investment decision.

47.     Mr. and Mrs. Porter offered to pay Mr. Zaldastani a combination of stock and cash. The May 2016 signed offer letter contained a section on compensation which stated that Mr. Zaldastani's monthly retainer would partly be "invested into the company." As described below, a bonus of $50,000 was in fact later made in the form of a Series A convertible note which Mr. and Mrs. Porter intended to convert ultimately into Series A Preferred stock.

48.     The May 2016 signed offer letter also contained a section entitled "Equity Grant," which granted equity to Mr. Zaldastani: "10% of LLC (null valuation) granted May 1, 2016."

49.     Mr. and Mrs. Porter's written offer was the result of ongoing verbal and written negotiations with Mr. Zaldastani which culminated in a signed offer letter. This reality contrasts sharply with the false portrayals painted by the Defendants publicly, namely that Mr. Zaldastani fabricated stock grants to himself without any knowledge of Mr. and Mrs. Porter. Such a thing could not and did not happen.

50.     The increase in Mr. Zaldastani's equity from 10% to 20% occurred when Mr. and Mrs. Porter asked Mr. Zaldastani to upgrade his role to the full-time CEO. Mr. and Mrs. Porter both agreed to issue Mr. Zaldastani a 20% interest in Excel Management.

51.     Excel Management could not afford to pay prevailing CEO wages and instead offered Mr. Zaldastani only a $120,000 annual salary. Mr. Zaldastani agreed to take a substantially lower salary than his market worth for a guaranteed future payment of $50,000 as well as on the condition that his 20% equity stake in Excel Management would be converted into equivalent ownership of the to-be-formed BrainTap, Inc. when Excel Management was converted from a South Dakota LLC to a Delaware C corporation. This conversion was being undertaken to facilitate venture investment.

52.     It would be exceedingly rare, if not unheard of, for a startup technology CEO not to have equity ownership in a startup company. Equity upside is a universal hallmark of venture capital-style startups and no elite venture investor would consider investing in a company where the CEO did not have equity ownership and upside in the business.

53.     Had Mr. Zaldastani not received the equity he was promised by Mr. and Mrs. Porter, he would never have agreed to work with Excel Management or the Company.

54.     Mr. Zaldastani inherited a company with significant technical and business deficiencies. Among other issues, Excel Management had taken shortcuts and omitted important processes and controls. Despite these deficiencies, during Mr. Zaldastani's tenure, BrainTap reincorporated in Delaware, raised approximately $5 million in venture capital investment, and the Company's sales grew 30% year over year, going from approximately $1.8 million to over $6 million under Mr. Zaldastani's leadership. Mr. Zaldastani used his personal network to raise most of these funds.

55.     Mr. Zaldastani's ownership of Excel Management was repeatedly documented and even reflected in tax records prepared by the company and its outside accounting professionals based upon information provided by Mr. and Mrs. Porter and signed by Mr. Porter for filing with the IRS. Mr. Zaldastani received K-1s from the company reflecting his ownership.

56.     For example, the fiscal 2017 Form 1065 partnership taxes filed with the IRS by Excel Management in 2018 and signed by Mr. Porter under penalty of perjury and felony tax fraud reflect both Mr. Zaldastani's 20% ownership stake as well as the $50,000 guaranteed payment. The K-1s for Mr. and Mrs. Porter show a decrease in their ownership from 90% to 80%. This Form 1065 is attached as **Exhibit B.** The 2017 K-1 provided by Excel Management to Mr. Zaldastani also reflected his increase from 10% to 20% ownership and the $50,000 guaranteed payment. A copy of Mr. Zaldastani's 2017 K-1 is attached as **Exhibit C.**

57.     Diligence information provided to investors, including updates, specified the equity owned by Mr. Zaldastani. Mr. Porter frequently referenced Mr. Zaldastani in investor meetings as the first investor and first outside stockholder of BrainTap and discussed Mr. Zaldastani's 20%

ownership stake.

58.    Mr. Zaldastani's stock ownership was repeatedly acknowledged by Mr. and Mrs. Porter and others in their presence, including in the October 2022 meeting in which Mr. and Mrs. Porter terminated Mr. Zaldastani as CEO. Mr. and Mrs. Porter even audio recorded this meeting.

59.    At no point prior to Mr. Zaldastani's termination as CEO did Mr. or Mrs. Porter dispute Mr. Zaldastani's stock ownership.

**B. Conversion Into BrainTap, Inc., Issuance of Common Stock, and Note**

60.    Excel Management converted into BrainTap, Inc., a Delaware corporation, in April 2021. At this time, the convertible notes in Excel Management raised by Mr. Zaldastani converted into Series A Preferred Stock in BrainTap, Inc.

61.    BrainTap, Inc. assumed all assets, obligations, and liabilities of Excel Management as part of the conversion into a Delaware C corporation.

62.    As part of the conversion, BrainTap, Inc. engaged in certain corporate actions typical of a corporate formation. On March 16, 2021, Mr. Zaldastani acting as sole incorporator elected the initial Board, consisting of himself, Mr. Porter, and Mrs. Porter.

63.    Also on March 16, 2021, the Board acted by Unanimous Written Consent to take a series of standard formation actions, attached as **Exhibit D.** It elected officers, naming Mr. Zaldastani President and CEO, Mrs. Porter the Secretary, and Mr. Porter the Treasurer.

64.    Pursuant to the March 16, 2021 Unanimous Written Consent, BrainTap issued 10 million shares of Common Stock under the heading "ISSUANCE OF SHARES" as follows: 2,000,000 to Mr. Zaldastani, 4,080,000 to Mrs. Porter, and 3,920,000 to Mr. Porter. These issuances roughly reflect the equity ownership of Excel Management.

65.    The March 16, 2021 Unanimous Written Consent was validly executed by all three directors: Mr. Zaldastani, Mrs. Porter, and Mr. Porter.

66.    The March 16, 2021 Unanimous Written Consent also purported to adopt a stock incentive plan, but no plan was ever adopted by the Board or approved by the stockholders.

67.    As part of the conversion into a Delaware corporation and issuance of Series A

Preferred Stock, the three directors, Mr. Zaldastani, Mrs. Porter, and Mr. Porter, agreed to standard restrictions on their shares of Common Stock. For example, the Right of First Refusal and Co-Sale Agreement listed all three of Mr. Zaldastani, Mrs. Porter, and Mr. Porter as "Key Holders."

68.     The parties also agreed to a Voting Agreement with the Series A Preferred Stock investors, which listed all three of Mr. Zaldastani, Mrs. Porter, and Mr. Porter as "Key Holders."

69.     Key Holders are identified as a matter of standard practice in venture capital financings as those persons who hold significant shares of Common Stock. Anyone identified as a "Key Holder" would own a significant number of shares of a company and be critical to its operations. Venture investors seek to impose special restrictions on owners of those shares. Common Stock holders identified as Key Holders almost always pay special attention not only to the restrictions imposed, but also the list of other Key Holders. In other words, Mr. and Mrs. Porter had full knowledge that Mr. Zaldastani was identified as a Key Holder along with themselves. The Board unanimously, including Mr. and Mrs. Porter, reviewed and approved these documents.

70.     In connection with the Series A Preferred Stock financing, the Company provided information to its prospective and actual investors, including capitalization information, all of which identified Mr. Zaldastani as a holder of shares of Common Stock consistent with the March 16, 2021 grant by the Company's Board.

71.     Although Mr. and Mrs. Porter promised Mr. Zaldastani a $50,000 guaranteed payment, Excel Management never actually paid this amount in cash. Mr. Porter and Mrs. Porter agreed to handle the $50,000 debt as a convertible investment, like the other debt investors in the convertible note financing round. That is, Mr. Zaldastani became a holder of one of the many convertible notes held by investors, in the amount of $50,000.

72.     The 2017 federal taxes signed under penalty of felony tax fraud by Mr. Porter confirm the $50,000 guaranteed payment. Mr. Zaldastani reported and paid all required taxes on this amount even though he did not receive the actual cash. Mr. Porter even discussed with Mr. Zaldastani the personal tax consequences of Mr. Zaldastani's K-1 resulting from the guaranteed payment that was never received but documented by the convertible note.

73.     On the BrainTap document "Investment Funds Received by Date," Mr. Zaldastani is noted as having contributed $50,000 "Paid Through K-1."

## C. License Agreement, Stock Purchase Agreement, and Schedule of Exceptions

74.     One way Mr. and Mrs. Porter tried to ensure they could exert improper control over BrainTap's business was to execute a side license agreement, which governed the use by BrainTap of intellectual property purportedly controlled or created by Mr. Porter.

75.     A significant portion of the value of BrainTap resides in its ownership or exclusive rights to its library of content. A large portion of the library of content of BrainTap was allegedly developed by Mr. Porter.

76.     Mr. Porter set up the royalty system so he too would receive payments like other creators, despite having a large founder's share of the Company. Mr. Porter as an alleged concession to BrainTap entered into an agreement so that the Company could buy him out of future royalty payments with a one-time $5 million payment.

77.     However, unbeknownst to the investors or Mr. Zaldastani, Mr. Porter had an additional agreement that stated that if the ownership of Mr. and Mrs. Porter in BrainTap dipped below 50%, that Mr. Porter had the right to terminate the license agreement or immediately trigger the $5 million payment, a sum the Company never had the ability to pay.

78.     At the closing of the Series A Preferred Stock financing, Mr. and Mrs. Porter held less than 50% equity ownership, meaning they could terminate the license at any point unilaterally.

79.     This term was never disclosed to any investor in the convertible notes, the Series A Preferred Stock financing, or the subsequent SAFEs (a form of convertible security). Indeed, it was not even disclosed to Mr. Zaldastani until his termination, when the Company's alleged breach of this agreement was used as a bizarre basis to justify Mr. Zaldastani's termination.

80.     Therefore, no investor, including Mr. Zaldastani, knew that Mr. Porter had the right to effectively hold the Company hostage by taking his license rights back at any time, severely impairing the Company's library of content.

81.     The license agreements of which Mr. Zaldastani is aware are signed only by Mr.

Porter and Mrs. Porter, who signed on behalf of the corporate entity. Neither the Board nor stockholders ever approved an agreement allowing Mr. Porter to have the ability to unilaterally terminate his license to the Company.

82.     A core consideration for an investor in a venture capital-backed company, or for Mr. Zaldastani to join BrainTap as an executive with equity, is the ability of the company to own and be able to use (and continue to use) all intellectual property necessary or valuable to its business. Yet, despite having the unilateral right to terminate his license at any point following the Series A Preferred Stock financing, Mr. Porter never disclosed this fact to any investor, Mr. Zaldastani, or any member of the management team of BrainTap in connection with any of the sales of securities by the Company.

83.     No investor would have invested had they known that a substantial portion of what was represented as the assets of the Company could be unilaterally terminated.

84.     The Series A SPA contains a series of representations and warranties, standard for venture financings. Multiple representations require that Mr. Porter and the Company disclose the key terms of any agreement with the key owners, as well any encumbrance, restriction, or unusual term of any intellectual property agreement.

85.     In a venture financing, founders and the company are required to list all "exceptions" to the representations and warranties in something called a "Schedule of Exceptions." Venture investors use this schedule to the representations and warranties as a way to force founders and issuers to describe in detail all facts and side agreements which could have an adverse effect on the business so the investors can make a fully informed decision. Because founders and issuers often try to hide and lie about adverse facts, this process seeks to ensure full and complete disclosure to prevent securities fraud.

86.     The Series A SPA contained standard language that obligated Mr. Porter and the Company to describe the complete terms of all of Mr. Porter's deals with the Company, including all side deals, and to list the exceptions from the representations and warranties in detail.

87.     The Schedule of Exceptions only listed the existence of what was purported to be a

standard license agreement, but did not describe any of its terms and did not disclose any right to terminate unilaterally. When Mr. Porter was asked about his agreements, he stated he had an agreement that gave the Company the option to buy out his royalty stream for $5 million. However, he never disclosed that any agreement gave him the unilateral right to terminate the license at any time following the closing since the 50% threshold was triggered upon the completion of the Series A Preferred Stock financing.

88.     The Schedule of Exceptions did not modify the representations and warranties in any way, so the relevant representations and warranties in the Series A SPA remain as written, unmodified. Investors had a legal right to rely upon the representations and warranties and, in fact, did so.

89.     The full copies of relevant license agreement and all amendments and side agreements were never provided to any investor as part of diligence, either in a data room or directly. Investors only found out about the true terms years later. The revocation right was never disclosed in any document in connection with the notes, the Series A Preferred Stock financing or any of the SAFEs. Investors are outraged and would not have invested had they known of these terms.

90.     None of the Plaintiffs, nor any other investor, would have invested in BrainTap if the investor knew that the Company's rights to most of its intellectual property were tenuous and immediately revocable, or could be used as blackmail by Mr. Porter against the Company.

91.     Indeed, Mr. Porter could unilaterally cause a breach and a right to terminate in other ways, such as by not paying himself in such a manner as to induce a material breach of his agreements, since Mr. Porter has unchecked and unsupervised control over all royalty payments.

92.     When Mr. Zaldastani confronted Mr. Porter about this concealment and fraud upon investors, Mr. Porter stated that he did not need to care, as he could choose by himself to bankrupt the Company and take his intellectual property and start a new company at any time. Mr. Porter then said that no one could do anything about it.

**D.  The Company Misled Investors Regarding Its Intellectual Property Rights**

93.    Problems with intellectual property allegedly owned or controlled by the Company extend beyond the licensing of Mr. Porter's content.

94.    During their investigation, Plaintiffs have learned, among other things, that:

- The Company did not independently develop all of the intellectual property it claims to have developed so it does not have ownership rights to key pieces of technology necessary to operate;

- The Company has failed to validly license necessary intellectual property rights owned or controlled by third parties;

- Mr. Porter's repeated claims about how he developed his technology are contradictory and omit that he often misappropriated third party rights without permission;

- The Company turned down favorable licensing opportunities which would have granted it valid licenses;

- The Company went "behind the backs" of valid intellectual property rights holders to have technology made overseas;

- The Company does not have valid exclusive licenses for technology it claims to; and

- The Company could be sued for injunctive relief by third party right holders, which would cause a material negative effect on the Company's operations and ability to sell and operates its products and services.

95.    Despite not having valid right, title, and interest, or license rights to all of its technology, the Company claimed to Plaintiffs in verbal statements and materials that it developed intellectual property it did not. Investors relied upon these statements.

96.    Repeatedly, Mr. Porter has made public statements, including at trade conferences and to prospective investors, that he is the source of the insights which cause the development of many of the Company's technologies when he is not. In an attempt to present himself as a visionary and inventor, he concealed important information and subjected the Company to unconscionable

risk.

97.     None of these facts were disclosed to any investor or to Mr. Zaldastani and none are disclosed in the Series A SPA or its Schedule of Exceptions, even though the Company was obligated to disclose all such issues regarding intellectual property ownership.

**E.  Mr. Porter Taking False Credit for Content to Misappropriate Company Funds**

98.     The gamesmanship over the library of content did not end with the concealed license terms. Mr. Porter attributed to himself improper credit for hundreds of pieces of content in the library, allowing himself to receive additional and undeserved royalties without oversight of the normal expense approval process.

99.     As part of the BrainTap model, it pays royalty payments to those who create content. Mr. Porter never permitted any oversight or checks on the attribution or the royalty payments made. Mr. Porter keeps records himself of who is entitled to royalty payments and no one is able to review or check Mr. Porter's calculations, despite many attempts by Mr. Zaldastani and the Company's outside accounting firm to have visibility into and oversight over the calculations.

100.    For example, Mr. Porter tagged himself as an authorized royalty recipient on hundreds of tracks in the Company's library, despite his not having written the script for those tracks or voicing those tracks. Indeed, Mr. Porter even tagged himself to receive credit on tracks created by a creator who died as well as on tracks which belonged to the Company, and thus should not result in a payment to any outside creator.

101.    This scheme allowed Mr. Porter to divert hundreds of thousands of dollars, possibly millions of dollars, to himself improperly. These funds are precious assets needed to grow and expand the business which Mr. Porter used instead to enrich himself.

102.    Mr. Zaldastani tried to remove Mr. Porter from the role of oversight over royalty payments since Mr. Porter was the primary beneficiary and he operated with impunity to assign and reassign credits to benefit himself and family members. However, Mr. and Mrs. Porter used their positions as the majority of the Board to thwart any such oversight. Mr. Zaldastani repeatedly discussed with Mr. Porter the need to reduce or delay payments in order to invest in Company

growth and to attract more venture investment. Mr. Porter flatly rejected any interference with the amount of royalties or his oversight of the royalty process. Although Mr. Zaldastani raised the issue of improper payments repeatedly at Board meeting, each time he was shut down by Mr. and Mrs. Porter.

103.    Mr. Porter represented to prospective investors that he was only making $200,000 a year, when in fact he was making a multiple of that number because of the magnitude of the royalty payments. The Company's outside accounting firm even stated that Mr. Porter "made out like a bandit."

104.    The Company's external accounting firm repeatedly raised to management the magnitude of the royalty payments and the lack of backup supporting documentation and oversight. When the external accounting firm wished to have a process in place to verify the accuracy of the payments, Mr. Porter acted to stop any oversight. Rather than submit to questions about external audits and independent confirmation of calculations, Mr. and Mrs. Porter ultimately terminated the relationship with the external accounting firm and returned accounting functions to a family member on the Company payroll.

105.    The full extent of the manipulation of the royalty system for Mr. Porter's personal enrichment is unknown.

## F.  Other Misappropriation of Corporate Funds

106.    Mr. and Mrs. Porter's pattern of misusing corporate funds did not end with the improper royalty scheme as Mr. and Mrs. Porter contributed to many financial irregularities.

107.    For example, Mr. and Mrs. Porter charged to the Company expenses for a personal trip to Europe to celebrate their anniversary. As another example, while on a trip to Las Vegas, Mr. Porter charged to the Company expenses he incurred at the Sapphire Strip Club, billed as "the world's largest strip club." No company business was conducted during Mr. Porter's visit to the Sapphire Strip Club. Mr. Porter also expended significant Company resources attending events which produced little to no return on investment for the Company, but were more for Mr. Porter's vanity and his personal brand.

108.    Despite complaints by Mr. Zaldastani, Mr. Porter did not curtail his profligate spending on unnecessary events. The pattern of Mr. and Mrs. Porter using the Company's bank account to fund their personal expenses escalated into a major issue with Mr. Zaldastani and the Company's outside accounting professionals.

109.    In May 2021, Mr. Zaldastani, frustrated with Mr. Porter self-reimbursing his credit card statements and expenses without oversight, demanded that Mr. Porter follow a process where his expenses would be approved. Specifically, Mr. Zaldastani wrote "We discussed yesterday that you were going to submit those … expense reports …. But not that you would pay yourself… It's no different for any of us. You, [Mrs. Porter], or I making any payments to our self's [sic] or to any family associate member is a big red flag. If [the accounting firm] had not caught this, this would have been an audit disaster. Please reverse the PayPal payment and submit expenses…. Self dealing is very dangerous and that's how this comes across…. Hope this is very clear."

110.    Mr. Porter was unrepentant. He responded to Mr. Zaldastani's message: "I can write a check anytime…. Before Jan I paid my cards weekly directly…. It's being paid the same way it has always been paid…. Also, I set up a personal account on Bill.com to pay it directly. I don't want it paid to my Company as it is not income and I don't want our accounting firm adding it to my Company 1099. It's [personal account]. Now you want me to wait to be paid. I don't like where this is headed."

111.    The use by Mr. and Mrs. Porter of the Company credit card for personal expenses was so endemic that the outside accounting firm sent a message to the BrainTap management team expressing concern. The message stated "We need to ensure that there are no more personal transactions billed on the business credit cards and even recommend disconnecting those feeds from [QuickBooks]. This would apply to any card that is not directly and specifically in the company's name only. As you move to a C corporation and the need to meet GAAP reporting guidelines and, potentially, audits, if these expenses are co-mingled, you risk not only severe tax implications, but also a misrepresentation of the health of the business."

112.    Mr. Porter continued to reimburse himself with no oversight despite these attempted

interventions from the Company's independent accounting firm. Even when Mr. Zaldastani tried to implement rudimentary controls, Mr. Porter refused to abide by them. For example, in May 2021 after Mr. Porter failed to comply with documentation requirements following the outside auditor letter, Mr. Porter wrote, "OK, I am super pissed. WTF on my reimbursement. Don't treat me like a staff person goddammit…. The letter from the Bookkeepers is way out of line. You reimburse and then we work out the details."

113.    Mr. Porter was so dissatisfied with the attempted financial controls that he gave himself full admin read and write access to the Company's QuickBooks account on July 23, 2022, which enabled him to make changes. This unilateral change outside of normal financial controls caused the outside accounting firm to express concern that they would be unable to stand behind financial statements since Mr. Porter could make changes without any review, oversight, or checks.

114.    Eventually, Mr. and Mrs. Porter removed the outside accounting professionals who expressed concern and housed the finance function inside the Company with one of their relatives.

115.    There are other self-interested transactions that occurred outside disclosure and oversight. For example, after Mr. Zaldastani was terminated, Mr. and Mrs. Porter caused the Company to enter into a multi-level marketing agreement, which Mr. Zaldastani had opposed. On information and belief, Mr. and Mrs. Porter had a financial interest with the other party that allowed themselves to be enriched by the deal. Upon information and belief, this conflict was neither disclosed nor validly approved by stockholders.

116.    Professional investors insist on internal controls over finances to prevent opportunities for self-enrichment. The desire of investors to have rigid independent financial controls is even more acute when there is a history of financial distress and potential desperation among senior executives, as the temptation to misappropriate assets without oversight is high. Indeed, Mr. and Mrs. Porter had previously filed a Chapter 7 bankruptcy, a fact never disclosed to Mr. Zaldastani or any of the investors in the Company. Had this fact been disclosed, investors likely either would not have invested or would have negotiated for additional outside checks and controls on spending of corporate funds as part of the financing.

117.    Mr. and Mrs. Porter terminated Mr. Zaldastani and fabricated pretextual reasons in part so they could enrich themselves at the expense of the Company and its stockholders without his interference or the interference of outside accounting and audit professionals.

118.    The full extent of the improper use of company assets for personal use is unknown.

**G. Nepotism**

119.    Mr. and Mrs. Porter used the Company and investor money to support various family members who were largely unqualified to hold the positions they occupied, and which, in some cases, were used to cover up wrongdoing.

120.    For example, the Company employed Mr. Porter's brother, who engaged in tax fraud during his employment, costing the Company time and money to handle ancillary issues such as wage garnishment. This same brother later had an affair with another employee in the office, breaking up her marriage and causing unnecessary strife in the office. The Company would have normally fired any other employee for similar behavior but Mr. Porter told Mr. Zaldastani that the brother was "untouchable."

121.    As another example, Mr. Porter's sister was the Excel Management accountant despite lacking the skills necessary to perform her duties at the level required for a company of this size and scale. She was told what to do by Mr. Porter and followed his directives, which meant that the Company lacked the traditional checks and balances that a proper finance function provides. In an attempt to address this deficiency, Mr. Zaldastani hired a professional outside accounting firm to perform the accounting duties required of a venture-backed company. Ultimately, however, Mr. and Mrs. Porter removed the accounting firm after they fired Mr. Zaldastani, following numerous attempts by the accounting firm to stop improper financial practices by Mr. and Mrs. Porter. This action had the effect of covering up financial irregularities by Mr. and Mrs. Porter.

122.    The Company employed Mr. Porter's sisters, brother, as well as his sister-in-law and three of her daughters, along with nieces and nephews. Members of the executive team were told by Mr. Porter that they could not object to the hiring of family members.

123.    Mr. Porter not only used the royalty payments, over which he had complete control,

to direct payments improperly to himself, but also to family members without oversight or accountability.

124.    For example, Cheree Porter, the daughter of Mr. and Mrs. Porter, would receive a royalty payment every month. When Mr. Zaldastani learned of these payments, he was unaware of any contributions she has made or written documentation to back up any obligation for the Company to provide her royalty payments.

125.    As another example, Michael Porter, Mr. Porter's brother, received monthly royalty payments of $6,000. The outside accounting firm tried to make calculations to justify this payment based upon session counts, but was only able to justify approximately 1/6 of the amount Michael Porter was actually paid. The outside accountant said that the "session counts don't add up to anything close to what [Michael Porter's] getting," the "math counts" do not work for his calculations, and characterized the payments to Michael Porter as "some kind of backdoor deal." The outside accounting firm even speculated that there might be potential criminal liability for these payments.

126.    In other words, the royalty accounting system operated as a family "slush fund" so that Mr. Porter could skirt any controls on diverting money to himself and family members without oversight.

127.    The true extent of the direction of company funds to family members is unknown, but upon information and belief, is over $1 million.

**H.  Violations of Securities Laws in Fundraising and Potential Tax Fraud**

128.    Many of the schemes employed by Mr. and Mrs. Porter constituted potential legal violations or exposed the Company to unnecessary civil exposure.

129.    For example, Mrs. Porter attempted to hire an unregistered broker dealer to illegally raise funds for BrainTap. Upon learning of this, Mr. Zaldastani contacted Company counsel and received an opinion that such actions were improper. Mr. Zaldastani shared this opinion with the full Board.

130.    Despite the illegality and opinion from Company counsel, Mrs. Porter insisted that it

was acceptable to proceed with raising funds with an unregistered broker dealer. Company counsel disagreed and stated, among other things, "[Mrs. Porter's] statement that the use of unregistered finder is 'a completely gray area that the SEC has not regulated at all' is an incorrect assessment…. Currently there are no rules granting safe harbor to issues utilizing such finders…. There are several consequences for using an unregistered finder." The communication then goes on to describe various violations of U.S. securities laws, state securities laws, the Securities Act of 1933, and the Exchange Act, including potential criminal penalties to the Company.

131.    The Company's counsel further stated that "As directors and officers of the company, the Porters and you have fiduciary responsibilities to the company…. There are several sophisticated investors in BrainTap, who after learning about the circumstances of the capital raise and use of an unregistered broker, will have issue with the raise … resulting in unintended consequences including claim of breach of director/officer fiduciary duties."

132.    Despite this information, Mr. and Mrs. Porter insisted on continuing their scheme in violation of clear advice from Company counsel. Mr. Zaldastani's attempt to stop such illegal behavior was one of the reasons for his being terminated as CEO.

133.    On information and belief, following Mr. Zaldastani's termination, the Company solicited funds with one or more unregistered broker dealers in violation of state and federal law.

134.    As another example, Mr. and Mrs. Porter spent Company funds for the purpose of getting a U.S. tax research credit, which Mr. Porter said would not be used for the Company's benefit, but for the personal benefit of Mr. and Mrs. Porter, who would take the refunds personally. Mr. Porter justified this position by saying he was an owner and the owners deserve to take the credit. When Mr. Zaldastani objected, Mr. Porter offered to cut Mr. Zaldastani in on 20%, his then ownership stake. Mr. Zaldastani never received any of these funds and does not know the result of this scheme to take the credit for personal gain.

135.    Upon information and belief, some of the tax credit scheme could constitute violations of U.S. tax laws.

136.    The full extent of the use of unregistered broker dealers and use of tax schemes

involving Company assets for personal gain is unknown.

**I. Mrs. Porter's Duties as Secretary**

137.    Mrs. Cynthia Porter has a series of legal duties not only because of her position as an officer and director of BrainTap, but also because of her position as Secretary.

138.    On information and belief, Mrs. Porter failed to document actions of the Board that Mr. Porter and she later wanted to pretend never happened, or destroyed those notes and records after the fact.

139.    The Board often met weekly or multiple times a month. Despite this, Mrs. Porter frequently never took notes nor circulated minutes afterward despite her legal duty to do so.

140.    Mr. Zaldastani complained about the lack of appropriate documentation and the informal nature of many of the meetings, but his requests to ensure proper documentation of corporate actions were ignored. Indeed, Mr. and Mrs. Porter would use their own lack of record keeping as a basis to contend that corporate actions and discussions they approved never occurred. Mrs. Porter failed to circulate minutes to the full Board in a timely manner, and often not at all. Indeed, it is likely that most meetings were never documented by her at all or that records and minutes were later altered or destroyed to hide valid approvals which Mr. and Mrs. Porter later wished to deny.

141.    As Secretary, Mrs. Porter also had duties to ensure the accuracy of the stock ownership and capitalization table maintained by the Company. The Company maintained its capitalization table on Carta, Inc., a platform used by many venture capital-backed companies.

**J. Pathos Ethos Relationship**

142.    As one major example of an action fully approved but later denied, the full Board was involved in and approved all the terms of a relationship with a third-party software developer, Pathos Ethos, Inc. ("Pathos Ethos").

143.    Most technology startups have deep in-house technology teams to develop their software and technology-based platforms. Because Mr. and Mrs. Porter refused to hire an in-house Chief Technology Officer ("CTO") and an associated software team due to the salary and equity

dilution necessary to attract good talent, the management team of BrainTap was forced to find a creative solution.

144.    Mr. Zaldastani created a solution whereby the Company would contract with Pathos Ethos, a North Carolina-based software development company, as its outsourced technology department. Pathos Ethos agreed to charge the salary and benefits of its software workers, plus act as outsourced CTO for a fixed amount of money and equity. These employees were effectively leased to the Company so it could have its own devoted technology team. The Pathos Ethos relationship permitted the Company to have a dedicated technology team at a fraction of the cost and equity dilution it otherwise would bear to hire a similar team full-time. Pathos Ethos also agreed to permit the transfer of its employees to the Company should it engage in a trade sale or other acquisition transaction in order the enhance the Company's valuation. The fact that Pathos Ethos had equity upside made it possible for it to value the relationship with the Company as an investor and not as a mere vendor/customer relationship.

145.    The existence of a dedicated technology team is a crucial item of diligence for most technology-focused venture capital investors. Indeed, technology is often one of the most important areas for venture capital investors. Further, most venture capital investors who invest in software-enabled companies understand that such companies are often significantly valued in acquisitions by their number of engineers and the depth of the technical talent. A company without its own team, or a team that could be sold as part of an acquisition, would usually be worth substantially less.

146.    Investors in the Company in part valued the Company because it had access to a dedicated team of engineers and could sell the Company with that talent included. The Company pitched to investors the benefit of the Pathos Ethos relationship, which gave the flexibility and valuation upside of a dedicated technology team, at a fraction of the cost and equity dilution.

147.    The Board and Mr. and Mrs. Porter specifically were well aware of the details of the Pathos Ethos relationship and all actions were discussed at Board meetings and approved.

148.    Despite the benefits of the Pathos Ethos relationship, Mr. Porter took actions to sabotage the relationship, including alienating the Pathos Ethos team, attacking the skill of the

developers, and disputing terms which were already approved by the Board.

149.    Mr. and Mrs. Porter also later denied the validity of the equity issued to Pathos Ethos, despite their approval of it and the equity being the basis of the transaction. The Company and its Board specifically filed an action in the North Carolina Business Court which falsely denies the existence of their actions and the validity of the stock issued, misusing corporate assets to make claims not based upon fact.

### K. Broken Equity Promises

150.    Breaking equity promises is nothing new to Mr. and Mrs. Porter. It is a common practice for Mr. and Mrs. Porter to promise equity, then never deliver it or to attempt to revoke it.

151.    For example, Mr. Kevin Phillips was hired as the Chief Operating Officer of BrainTap and was promised equity in BrainTap constituting 8% of the Company's ownership on a fully-diluted basis. He was also promised a seat on the Board. Mr. and Mrs. Porter never intended to keep these promises. Not only was the stock never issued, the Company never even had a valid option pool from which to issue the shares. When the Company terminated Mr. Phillips, he never received any of the equity promised to him.

152.    Mr. Porter agreed to issue equity equaling 1% of BrainTap's capitalization to Duke University because of the strategic value offered by the Duke University name and marketing and testing opportunities on the Duke campus, but no equity was ever issued. Indeed, Mr. and Mrs. Porter, having once approved the issuance, now deny its existence and are refusing to honor it. Recent Company capitalization information on Carta shows no equity ever issued to Duke University. A copy of BrainTap's executed DukeOne Pledge is attached as **Exhibit E.**

153.    Mr. and Mrs. Porter also promised equity to a number of other employees, but, on information and belief, no equity was ever in fact issued, nor could it have been without a valid option pool or other corporate actions to issue shares. Recent Company capitalization information on Carta shows no equity ever issued to any of these individuals.

154.    As another example, on October 6, 2021 Mr. and Mrs. Porter executed a DocuSign promising "0.5% in equity options" in BrainTap's employee stock option pool to an employee of

BrainTap, Ms. Kensy Lee Ryan. However, this grant was never reflected in the Company's stock records and, indeed, no option pool ever existed. To this day Ms. Ryan has never received her equity.

155.    Mr. and Mrs. Porter also attempted on multiple occasions to deny the validity of the equity issued to Mr. Zaldastani, as described below.

## L.  Tensions Rise Between the Porters and Mr. Zaldastani

156.    In 2022 tensions between Mr. Zaldastani and the unified team of Mr. and Mrs. Porter intensified. Mr. Zaldastani became increasingly frustrated at what he perceived as the lack of professionalism and desire of the Porters to support the measures necessary to build the best company. Mr. Porter in particular was upset that Mr. Zaldastani began to receive credit in the industry for the success of BrainTap. Mr. and Mrs. Porter also grew increasingly upset at Mr. Zaldastani's actions to prevent illegal, unprofessional, or self-dealing conduct by the Porters.

157.    For example, they blamed Mr. Zaldastani for mistakes their own family members made, including but not limited to: Mr. Porter's sister-in-law, acting as the Company's Controller, failed to record invoices; the Porters suddenly "forgot" business discussions the three directors had about critical issues; and contending they did not have full access to the Company's legal records and counsel as well as its accounting system. Indeed, Mr. Porter was the Treasurer and Mrs. Porter was the Secretary at all times and always had access to this information.

158.    The Porters began to reverse and interfere in Mr. Zaldastani's decisions more and plotted to replace him. Mr. and Mrs. Porter manufactured many pretextual reasons to make it appear that Mr. Zaldastani's performance was substandard, when the opposite was true. For example, in 2022, Mr. Porter sent a communication to Mr. Zaldastani outlining issues that he and Mrs. Porter allegedly had with Mr. Zaldastani at a time when Mr. Zaldastani was actively engaged in fundraising for BrainTap.

159.    Because almost all the funds raised came from Mr. Zaldastani's network or credibility, Mr. Zaldastani stated that he needed to stop fundraising in order to address the concerns expressed by the Porters. After verbal discussions which addressed the substantive merits of the

letter, Mr. Porter withdrew it and stated that Mr. Zaldastani should continue fundraising and any disagreements would be worked out. For example, Mr. Porter wrote to Mr. Zaldastani on October 12, 2022, "go ahead and continue your fund raising. We will continue to work out the rest as we go." Based upon reassurances from Mr. Porter that everything would be worked out, Mr. Zaldastani continued to close investors, including $50,000 from an existing investor and $25,000 from a new one.

160.    Mr. Porter made this false promise to induce Mr. Zaldastani to continue raising money, which BrainTap needed to fund Mr. and Mrs. Porter's financial schemes. Mr. Porter simply did not want the fundraising to stop and deceived Mr. Zaldastani to induce him to continue fundraising. The promises Mr. Porter made to Mr. Zaldastani were false and Mr. and Mrs. Porter were already taking steps to terminate Mr. Zaldastani.

161.    These statements and actions created a new agreement between the Company and Mr. Zaldastani and altered any "at will" employment relationship with Mr. Zaldastani.

162.    In reliance upon this promise that his employment would continue, Mr. Zaldastani continued to engage in fundraising. Mr. and Mrs. Porter caused the Company to terminate Mr. Zaldastani as CEO less than two weeks later.

163.    Because most of the investors were connected to Mr. Zaldastani, they invested on the understanding that Mr. Zaldastani was the CEO and that there were no facts or circumstances that would change that situation.

164.    As one example, on October 24, 2022, Dr. David Martin invested $25,000 into BrainTap's SAFE instrument because he believed in Mr. Zaldastani's leadership. On that same date, Mr. and Mrs. Porter acted to terminate the employment of Mr. Zaldastani despite their promises to Mr. Zaldastani to the contrary. Outraged and feeling deceived, Dr. Martin demanded multiple times in writing that BrainTap return his investment. Dr. Martin stated that he wished to have his money returned, as he only invested based upon the representation that Mr. Zaldastani was the CEO and had no wish to invest without him. On information and belief, Mr. Porter refused to return Dr. Martin's money because he believed that investors do not sue so he did not need to listen to Dr. Martin or

other unhappy stockholders.

## M. Mr. Zaldastani's Termination

165.    On October 24, 2022 Mr. and Mrs. Porter met with Mr. Zaldastani to terminate his employment and his membership on the Board. However, Mr. and Mrs. Porter did not validly terminate Mr. Zaldastani's position as a Director under the Company's governing documents and Mr. Zaldastani to this day remains a valid Director of the Company. All actions taken without his participation are invalid.

166.    Mr. and Mrs. Porter initially offered Mr. Zaldastani a $250,000 severance package, then revoked it. As part of the plot to erase Mr. Zaldastani's legal rights, Mr. and Mrs. Porter attempted on multiple occasions to void or fail to recognize the validly issued equity interest Mr. Zaldastani has always held and still holds in the Company.

## N. Mr. Porter's Unilateral Decision to Destroy the Working BrainTap App

167.    When Mr. and Mrs. Porter terminated the employment of Mr. Zaldastani, one of the first actions taken by Mr. Porter was to terminate the relationship with Pathos Ethos and hire "cheaper" engineers in India to take over the technology development. Mr. Porter effectively terminated six software engineers dedicated to the Company as a result of this action, destroying value and continuity of technology support. By terminating the software team, Mr. Porter has significantly reduced the Company's acquisition value and ability to compete against other companies who continue to innovate technologically. The value of the Company is now primarily in its library of legacy content and is greatly diminished.

168.    As part of his frenzy to rip any vestiges of Mr. Zaldastani's success away, Mr. Porter, without any oversight, advice, or authorization of any technical personnel, logged into the Company's Amazon Web Services ("AWS") account and manually deleted the BrainTap app entirely. He also killed the AWS keys, reversing any way of recovering from the decision to delete a live and working app.

169.    On information and belief, Mr. Porter lacks the necessary technical knowledge, skills, and training to make changes to a system as sophisticated as AWS in a live deployment

environment. His decision to delete the working app and keys was not consistent with what a reasonable and prudent person would have done. Indeed, it was grossly negligent and resulted in material damage to the Company and its value.

170.    When Mr. Porter panicked and tried to seek technical assistance to reverse what he had done, he dissembled and initially tried to deny that he was responsible for these actions. However, he later admitted that he was the one who deleted the app and keys.

171.    At the time Mr. Porter manually deleted the Company's existing app and keys, a replacement app was neither finalized or tested. Mr. Porter therefore deleted the only working version of the Company's app. The deletion of the app caused a significant disruption for users using and attempting to download the app, as actions by Mr. Porter caused the app to become non-functional immediately. The app deleted by Mr. Porter was stable, had high reviews, and was fully functional. The deleted app was rated approximately 4.6 out of 5 by users and was stable. The new app, rushed into production before it was ready, had a rating of approximately 3 and caused enormous brand disruption. As a result, the Company suffered a major service interruption and had to rush a beta replacement product from the India developers into launch. The product from the new India developers was not supposed to be released until 2-3 months in the future and was not ready for release.

172.    The Company's reputation suffered greatly from the disruption and the deletion of the existing app caused damage to the Company's value.

173.    Rather than admit that he unilaterally destroyed a working app by disabling its keys and deleting it, Mr. Porter falsely claimed that the issues were the result of Mr. Zaldastani and the outsourced technical team at Pathos Ethos. Neither of these claims is true. In fact, Mr. Zaldastani was by then long terminated as an employee and Mr. Porter deleted the keys and app entirely without consulting anyone, much less his former technical team, who would have vociferously advised him not to do it. Mr. Porter ended the Pathos Ethos relationship well before he deleted the keys. Mr. Porter was often verbally dismissive and abusive to technical personnel and had a reputation among them as someone who would take radical impulsive actions without consulting his

technology team or thinking it through. In this case, his actions resulted in irreversible damage to the Company's only working app.

174.     Blaming Mr. Zaldastani for something he had nothing to with to cover Mr. Porter's gross technical incompetence caused substantial damage to Mr. Zaldastani's reputation and constitutes actionable defamation

175.     To this day, Mr. Porter has never publicly admitted that he is responsible for the fiasco with the old app by his unilateral deletion of it and the associated AWS keys due to his own technical negligence.

**O. Defamation of Mr. Zaldastani's Name and Reputation**

176.     Mr. Porter's campaign of defamation against Mr. Zaldastani is a rich history of false and harmful statements that have damaged and continue to damage Mr. Zaldastani.

177.     Among other things, during an investor call, Mr. Porter stated to investors that Mr. Zaldastani defrauded BrainTap in various ways, which is false. Mr. Porter stated that Mr. Zaldastani outspent the budget every month and the Company was therefore out of operating funds. Again, both statements are false. Mr. Porter stated that Mr. Zaldastani was unable to build a company into something bigger and claimed that he misled investors. Both statements are false. Mr. Porter said that he had to put Mr. Zaldastani "where he belonged, out there on the street, because [Mr. Zaldastani] did not run this company in your interest or my interest…. We took back control of the company. It was in the hands of a crazy person…. It's the truth." These statements are false.

178.     Mr. Porter also stated that every business he had operated had been profitable before its first investor but BrainTap became unprofitable because of Mr. Zaldastani: "[W]e were profitable before we brought in one investor. We became unprofitable because of [Mr. Zaldastani]." The BrainTap business was not only unprofitable prior to outside professional investment, it was relying on high interest rate "hard money" loans to survive. It is ironic that Mr. Porter would tout his business and finance skills when Mr. and Mrs. Porter had a prior Chapter 7 personal bankruptcy. By contrast, the business grew substantially under Mr. Zaldastani with a likely enterprise value exceeding $100 million, which has since been largely destroyed by the actions of Mr. and Mrs.

Porter.

179.     In this same call, Mr. Porter blamed Mr. Zaldastani for the Company's lack of audited financials, for the lack of accuracy of the capitalization table, and for the problems in the Company. All of these statements are false and were made to people who know and invested in Mr. Zaldastani. Ironically, given the financial irregularities of the Company caused by Mr. Porter, he stated on the call that "we are going through audited financials because, to be honest, we found a lot of inconsistencies we need to report, and you'll learn about those too." Mr. Porter promised investors a forensic accounting to clean the Company's financial records. On information and belief, no forensic accounting ever occurred, or at least nothing was ever shared with stockholders. Instead, Mr. and Mrs. Porter had removed outside auditing personnel and placed their relatives in charge of internal financial controls.

180.     In August 2023, the Company circulated a letter to investors in BrainTap and others called "Investor Brief: Q1 2023." This letter was on Company letterhead and signed by Mr. Porter and is attached as **Exhibit F.** It contains many false and defamatory statements.

181.     The letter stated that Mr. Zaldastani "was also accused of breaching fiduciary responsibility, such as making unauthorized statements about business deals and not being transparent about legal matters and cash flow needs. Furthermore, Nicholas failed to manage the company's affairs properly, leading to a lack of employment contracts, poor cash flow management, and a culture of blame and frustration." While it is technically true that Mr. and Mrs. Porter accused Mr. Zaldastani of such acts, none are true and sharing them widely defamed Mr. Zaldastani as they falsely implied that the statements were true.

182.     The letter further stated that Mr. Zaldastani was accused of "certain decisions and transactions, that involved spending money without board approval, including an unauthorized reimbursement to himself for a personal donation to Duke University, unauthorized payment of personal expenses from company funds without the board's knowledge or approval, and directing key resources towards developing a new biohacking bundle without board input." Again, none of these statements are true and all defame and injure Mr. Zaldastani.

183.    For example, the full Board discussed and agreed to giving 1% equity to Duke University through the DukeOne initiative because of several important business, scientific, and marketing initiatives involving Duke University. This pledge was mentioned on the BrainTap website and was featured in other news outlets. On information and belief, Mr. and Mrs. Porter reneged on this pledge. In addition, over the course of many years, Mr. Porter approved expense reports by Mr. Zaldastani making donations to Duke University. Such donations were discussed and approved in Board meetings. For 2022, Mr. Zaldastani is still owed $10,000 in reimbursement for a donation to Duke University, which Mr. Porter initially approved, but later refused to pay.

184.    After Mr. Zaldastani's termination, Mr. and Mrs. Porter changed their minds and stated that Mr. Zaldastani never had approval to be reimbursed for donations, despite years of prior practice, and accused him of misusing Company funds, which is false. Further, in multiple public presentations Mr. Porter referred to Duke University as an equity holder in the Company, using it as a marketing tactic and attempting to validate the Company. Indeed, the Duke University relationship led to significant marketing benefits. BrainTap technology was involved in the Duke University Mental Wealth Day, the Healthy Duke Initiative, Duke Week of Wellness, and other events, resulting in enormous goodwill to BrainTap.

185.    Although Mr. Porter denied the Duke relationship and equity pledge, he himself signed an agreement entitled "Confirmation of equity pledge of DukeOne." The agreement explains: "This form is to help you confirm your intent to commit 1% or more of your company to supporting Duke University…. Thank you for your commitment to investing in the future of Duke University." Mr. Porter's signed this document and dated it March 30, 2017.

186.    The Duke University connection was so important that a majority of the Plaintiffs in this matter invested in part because of the Duke University connection and their own personal ties to Duke University. Indeed, universities often have similar programs precisely to induce its alumni to make venture and angel investments into the startups who make the pledge.

187.    The stockholder letter falsely stated that a remediation plan was implemented for Mr. Zaldastani, which he failed to adhere to. None of those statements are true. For example, the Board

minutes from the October 11, 2022 meeting reflect no mention whatsoever of any performance issues, nor would they since the topic never arose. Mr. Zaldastani also addressed all issues raised by the Porters, almost all of which were pretextual and false.

188.    The letter falsely also states that "Nicholas has additionally received two requests from legal counsel to provide information and documentation concerning these assertions, but to date he has failed to respond to these requests." These statements are untrue. Indeed, the information Mr. Zaldastani provided to Dentons appears to have led its withdrawal as Company counsel rather than continue as part of an obvious fraud, necessitating that the Company find new counsel to prosecute its knowingly false claims.

189.    The letter states "After BrainTap terminated Nicholas' employment, it was discovered that App development was mismanaged under Nicholas across two separate vendors and that the responsibility of maintaining custody of access credentials to business-critical systems including V2 and V3 applications was abdicated to the software development vendors. This ultimately led to the company's inability to correct the January, 2023 catastrophic failure of the V2 application and the emergency launch of the V3 application, and has additionally created a dispute with one of the vendors as shown below."

190.    These statements are false and also blame Mr. Zaldastani for the technical negligence and reckless actions of Mr. Porter himself. He alone is responsible for an entirely avoidable and tragic technology incident.

191.    Mr. Porter has told third parties that Mr. Zaldastani did not have the legal authority to sign contracts on behalf of BrainTap and that such agreements were void. Those statements are false.

192.    Mr. Porter told third parties that Mr. Zaldastani had defrauded BrainTap. Those statements are false.

193.    Mr. Porter has told third parties that Mr. Zaldastani stole Company funds. Those statements are false.

194.    The full extent of Mr. Porter's defamatory statements are unknown to Mr. Zaldastani.

**P. Attempts to Steal Mr. Zaldastani's Equity**

195.    Since Mr. and Mrs. Porter terminated Mr. Zaldastani's employment, they have made many attempts to deny the existence of his equity and steal it back.

196.    In 2023, BrainTap used Company resources to hire the New York office of the law firm Dentons to threaten Mr. Zaldastani with loss of his stock unless he could prove he owned it.

197.    Mr. Zaldastani responded, directing Dentons to the "Excel Management, LLC and BrainTap, Inc. tax returns; BrainTap, Inc. Series A filing documentation; and Board Meeting notes associated with Tax Returns and Series A filing." He also stated that "Each year's tax returns were always reviewed and signed off by Dr. Patrick Porter and Cynthia Porter before submission to the IRS. And of course, the entire board: Dr. Patrick Porter, Cynthia Porter, and I electronically signed off on the Series A paperwork. You will see in all these documents that I have clear ownership of 2,000,000 Common Shares of BrainTap, Inc. and 292,093 Series A Preferred Shares of BrainTap, Inc. To assist your 'investigation,' which is an embarrassment to the fine reputation of Dentons, I, while having no legal obligation to do so, have attached my 2018 K-1 showing my 20% ownership in the Excel Management, LLC which converted to 2M shares in BrainTap, Inc., and the $50K payment to me for consulting services that was used to purchase my 292,093 Series A Preferred Shares of BrainTap, Inc. You will see the same supporting documentation in the Series A filing and in 2019, 2020, and 2021 tax filings." A copy of this correspondence is attached as **Exhibit G.**

198.    Mr. Zaldastani did in fact provide documentation to Dentons, acting as counsel to the Company even though the Company already had these documents and had no need to receive them again.

199.    Despite full knowledge that the stock to Mr. Zaldastani was validly issued and approved, the Company, through new counsel, filed a fraud claim in the Business Court of North Carolina, alleging that Mr. Zaldastani "unilaterally issue[d] himself common stock and preferred shares in Braintap." The Company further represented to the North Carolina Court that Mr. Zaldastani "was neither a member of nor an economic interest owner in Excel Management" and that Mr. Zaldastani "issue[d] these shares to himself without the approval or knowledge of Braintap's

board of directors," and that Mr. Zaldastani never sought or received approval from the Board for these shares.

200.    All of these statements are false as demonstrated by contemporaneous documents, including documents filed with the IRS under jeopardy of felony tax fraud and signed documents from Mr. and Mrs. Porter. Yet, despite having the documentary proof, the Company and its counsel continue to make statements to a court that they know to be entirely false.

201.    Because the seeking of advice in furtherance of a fraud and with no good faith basis is not a valid action by a reasonable and prudent director or officer, and indeed advice sought in furtherance of a fraud is doctrinally not even privileged, the use of corporate funds for such a purpose is a violation of the duties of Mr. and Mrs. Porter and the entire Board.

202.    Despite Mr. Zaldastani's validly owning equity, the Company has removed Mr. Zaldastani from investor calls and also denied his information requests because it falsely maintains he is not a stockholder.

**Q. Violations of Corporate Obligations**

203.    The Company and the Board have failed to comply with numerous legal obligations and also have caused and approved the misuse of corporate assets.

204.    Since Mr. Zaldastani's termination, the Company has not had a formal stockholder meeting as required by the Company documents and Delaware law. The Company had a virtual stockholder update meeting in December 2022, but this meeting excluded key stockholders and others were deliberately disconnected from the virtual meeting, including Mr. Zaldastani and Mr. Sam Park, a former COO.

205.    Mr. Zaldastani was never properly removed from the Board and remains a director to this day. All corporate actions taken without his involvement are without legal authority.

206.    On information and belief, the Company incurred indebtedness exceeding $200,000 without required stockholder approval, perhaps on multiple occasions.

207.    On information and belief, other actions that require stockholder approval, or approval of subsets of the stockholders, such as the Preferred Stockholders, have not been submitted

for approval.

208.    The Company has failed to provide information necessary for stockholders to understand the true state of the business and has specifically failed to make available information necessary for stockholders to understand the violations of the various Series A Preferred Stock financing documents. Indeed, when Mr. Zaldastani requested that such information be provided to all stockholders non-discriminatorily, the Company denied the request because Mr. Zaldastani was not a stockholder, which is false.

209.    On information and belief, the minute book was falsified and doctored. The true extent of the falsification cannot be ascertained without access to the minutes, which the Company has refused to provide.

210.    The Company has used its resources to fund a vendetta by Mr. and Mrs. Porter against Mr. Zaldastani, including by initiating malicious litigation and committing fraud upon the North Carolina Business Court through counsel.

**R.  Failure to Raise a Series B**

211.    In March 2022, the Company approved raising up to $4 million through convertible equity interests known as SAFEs. Investors were promised that the Company would convert the SAFEs into Series B Preferred Stock and that the Company would work diligently to close such a financing. Mr. Zaldastani raised approximately $1 million in SAFEs and was also pursuing multiple potential leads for a Series B Preferred Stock financing at the time of his termination.

212.    After the termination of Mr. Zaldastani, the Company has made no serious attempt to pursue a Series B Preferred Stock financing, nor could it given that the Company destroyed its technology team, impaired its value, fired a highly respected and experienced technology CEO, and continues to divert Company assets for personal use.

213.    Indeed, Mr. and Mrs. Porter never had any intention of pursuing further venture financings of the Company. Instead, they used Mr. Zaldastani to raise money, knowing they planned to terminate him. Their goal was not to grow a venture-backed business, but to divert resources for their personal use and to gain majority control by improperly trying to cancel Mr. Zaldastani's

shares.

214.    Investors relied upon the explicit promises that their bridge financings through SAFEs would turn into Series B Preferred Stock expeditiously. Mr. and Mrs. Porter conspired to ensure that the SAFEs were raised as "bridges to nowhere" — except, of course, to the personal bank accounts of Mr. and Mrs. Porter and their family members.

## S.  Other Violations of Mr. Zaldastani's Rights

215.    The Company wrongfully terminated Mr. Zaldastani in retaliation for his attempts to stop illegal conduct by other members of the Board.

216.    The Company modified Mr. Zaldastani's employment relationship, making it not at will, through explicit promises of future employment. The Company breached that agreement when it terminated him.

217.    The Company still owes Mr. Zaldastani for his expense reports, which total at least $23,008.33. The Company never disputed the validity of any of these expenses and all are valid and consistent with the practice of the Company dating back years. The Company wrongfully refused to reimburse Mr. Zaldastani for these expenses, claiming that it would use the money owed to offset prior approved expenses which it unilaterally years after the fact recategorized to unauthorized. The Company is not permitted to do this.

218.    The Company failed to provide any documentation to back up the falsified and fabricated PTO balance it entered into the system after Mr. Zaldastani's termination. At the time the Company terminated Mr. Zaldastani, he was owed 93.58 hours of paid time off ("PTO"). The Company fraudulently changed Mr. Zaldastani's PTO hours to -18.42 in the Company's payroll system and refused to pay the accumulated wages to Mr. Zaldastani.

## T. Stonewalling by the Company and Board

219.    Almost all of the Plaintiffs have a history of having their concerns ignored by the Company, its offers, and directors since Mr. Zaldastani's termination. One Plaintiff, Dr. Martin, could not get a response from the Company when he wanted to rescind his investment over the issues described herein. As another example, on December 24, 2022, Mr. West Hubbard, writing on

behalf of two of the Plaintiffs and other stockholders, wrote to Mr. Manuel Diaz, one of the current Directors of the Company, that he had "been unable to reach the Porters.... in the hopes of getting the transparency we all agreed to." Mr. Diaz merely responded that "everything seemed fine," and provided no additional information about the Company. Plaintiff Salman Azhar followed up to Mr. Diaz after this reply saying "Sadly, the Porters have been avoiding me for a few months now." Mr. Diaz did not respond to Mr. Azhar.

220.    Stockholders began to learn of many of the facts contained herein (and others still under investigation). To help understand the depth of issues and expedite concerns, Mr. Zaldastani agreed, through counsel, to write to the Company to obtain information for the investor group, which counsel did on August 1, 2024 ("Request Letter"), attached as **Exhibit H**.

221.    The Request Letter began by stating the concerns of multiple stockholders, which included "the lack of transparency, potential self-dealing, interested party transactions, nepotism" and asked that the information be provided "equally, fully, and simultaneously to all stockholders of the Company":

> Mr. Nicholas Zaldastani and other stockholders of Braintap, Inc. (the "**Company**") have not been provided with corporate information necessary for their ability to protect their interests as stockholders. Mr. Zaldastani has been requesting such information for some time now, as have other stockholders. Many stockholders are rightfully concerned about the lack of transparency, potential self-dealing, interested party transactions, nepotism, as well as the general declining financial health, lack of fundraising, and the potential for insolvency of the Company.
>
> The stockholders have rights under Delaware's General Corporate Law, the financing documents, and bylaws, among other things. Because it would be easy to demonstrate to a Court the legitimacy of all requested information, we would prefer simply to have the Company provide this information without the need for legal enforcement so the stockholders can meaningfully assess their rights.
>
> *Mr. Zaldastani requests this information be provided equally, fully, and simultaneously to all stockholders of the Company.* I would suggest that transparency and openness would assist the Company in its relationship with its stockholders.

222.    The Request Letter began by asking for financial information, a current certified

capitalization table, and a list of Directors and officers, then became more detailed. Because the stockholders could not ascertain the propriety of certain actions, especially since the Company had never held a stockholder meeting (and no written consents had ever been solicited), the Request Letter asked for:

- The minute book of the Company from inception, including minutes of all meetings of the Board of Directors as well as all approvals by the Board of Directors, including those by unanimous written consent.

- All stockholder minutes of the Company from inception, including annual meeting and special meeting minutes, and all stockholder consents, including those in lieu of a meeting.

223.    Because the Company had taken on indebtedness without required stockholder approval under the Investor Rights Agreement, the Request letter asked for: "A copy of any loans or indebtedness taken or incurred by the Company, as well as all current balances and repayments made and yet owed, plus copies of all required approvals."

224.    Because investors became aware of the existence of and magnitude of the self-interested transactions described herein, the Request Letter also asked for:

- A list of all payments to Cynthia or Patrick Porter or their affiliates from inception of the Company with backup documentary support showing the calculation of the payments, including, without limitation, all royalty payments to the Porters or their affiliates and the backup of all royalty calculations.

- A list of all payments to family members of the Porters and their affiliates with backup documentary support showing the calculation of the payments. Family includes any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, nephews, nieces, aunts, uncles, and cousins of the Porters.

225.    To ensure compliance with the protective provisions which require stockholder approval under the Series A Preferred Stock financing agreements, the Request Letter asked: "Please confirm that since inception of the Company, the Company has taken none of the following actions. Please provide details and backup documents of any of these actions if they occurred, as well as any approvals obtained from the Board or stockholders":

- Sold, assign, licensed, pledged, or encumbered material technology or intellectual

property.

- Incurred any aggregate indebtedness or issued any bonds, notes or other obligations in excess of $200,000 in the aggregate in any fiscal year.

- Approved an annual operating or capital budget or made any capital expenditure (including those that are employment related) in excess of $200,000.

- Entered into or became a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such Person, including without limitation any "management bonus" or similar plan providing payments to employees in connection with a Deemed Liquidation Event, as such term is defined in the Certificate of Incorporation.

- Adopted or increased the number of shares of Common Stock reserved for issuance under any equity incentive or phantom equity plan. In fact, please provide a copy of any equity incentive plan, as, to the stockholder's knowledge, no plan was ever approved.

226.    The Request Letter also asked the Company to provide some routine updates under the title "Narrative Information," all of which would normally be uncontroversial as they concern standard matters which companies would want their investors to know about:

- An update on the status of the SAFE and the raising of the Series B Preferred round.

- The date of the next stockholder meeting and the next annual meeting date.

- A list of all equity promised to anyone which has yet to be issued by the Company.

227.    The Company responded on August 16, 2024 by declining to provide any of the requested information, relying on the false grounds that Mr. Zaldastani was not a stockholder of the Company and the information requested is not the kind which the Company is obligated to share, notwithstanding the legitimate concerns of the stockholders and the contractual information rights afforded the Series A investors. A copy of this response is attached as **Exhibit I.**

228.    Despite the explicit concerns raised about self-dealing, nepotism, lack of valid approvals, and other issues in the letter, the Board did nothing. It did not appoint a special committee to investigate, it did not review the concerns, it did not take any actions to ascertain whether as

fiduciaries they should exert oversight. Indeed, the Company continued to operate as it did before, "business as usual." The Board stonewalled, providing no responses to any stockholder, not even the plainly unobjectionable requests.

229. The disdain for the stockholders by the Company and its current Board is palpable. When one Director was told that a majority of the stockholders were upset with the Company, the Director replied that the Company could just hire lawyers in Los Angeles, Miami, and New York, who would all "get together and f*** them up," referring to the stockholders. Such statements betray a shocking disregard for the duties Directors owe stockholders under Delaware law.

## DEMAND FUTILITY

230. Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

231. Plaintiff brings portions of this action derivatively and in the right and for the benefit of the Company to redress breaches of the fiduciary duties of Mr. and Mrs. Porter, as directors at the time of the actions complained of herein.

232. Plaintiffs are stockholders or equity holders of the Company, were stockholders or equity holders of the Company at the time of the wrongdoing alleged herein, and have been stockholders or equity holders of the Company continuously since that time.

233. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights. Indeed, the Plaintiffs are literally representatives of a majority the non-interested stockholdings of the Company, as they own a majority of the stock not held by Mr. and Mrs. Porter. Plaintiffs anticipate additional stockholders will join this action.

234. As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute any portion of this action against Mr. and Mrs. Porter. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and prosecute this action.

235. Plaintiffs are informed by Company counsel that it believes the current Board consists of five directors: (i) Defendant Mr. Porter, (ii) Defendant Mrs. Porter, (iii) Mr. Manuel Diaz, (iv)

Jonathan Block, and (v) Vishal Baijal.

236. Because Mr. Zaldastani was never properly removed as a Director, the actual Board composition is disputed and Plaintiffs believe all actions taken by the Board are ultra vires and violate rules of corporate governance and law. Further, Plaintiffs cannot even ascertain the correctness of the Board composition proffered by Company counsel or whether all of these members were properly elected in accordance with governing documents. For example, Plaintiffs cannot analyze the myriad corporate irregularities in the purported actions to appoint Mr. Diaz, Mr. Block, and Mr. Baijal. Among other things, no stockholder meeting was ever even held or stockholder consent ever sought and the Company refuses to provide access to the minute books.

237. The current so-called Board engaged in numerous breaches of its own duties to stockholders. Among other things, it failed to hold required stockholder meetings, it engaged in failing to comply with reporting and approval requirements of the stockholders, it approved a lawsuit against Mr. Zaldastani despite having knowledge of the falseness of the allegations, it ignored accounting and financial irregularities and refused to investigate them, it failed to investigate allegations raised by Mr. Zaldastani and other stockholders when raised, it failed to respond to requests for information, it ignored information provided to it by Dentons, the outside counsel originally hired to intimidate Mr. Zaldastani, and ignored and failed to investigate information provided to current Company counsel by Mr. Zaldastani's counsel in July 2024.

238. At least one Director, Mr. Diaz, tried to buy Mr. Zaldastani's stock. After Mr. Zaldastani was fired as CEO, Mr. Diaz met with Mr. Zaldastani to buy Mr. Zaldastani's approximately 13% of the Company. Mr. Diaz negotiated on his personal behalf. Mr. Zaldastani said he would sell his stake for $13 million, the then fair value, but Mr. Diaz offered only $250,000. Mr. Zaldastani also said that any buyout of shares should be made open to other stockholders, not just himself.

239. Mr. Zaldastani tried to express concerns about Mr. and Mrs. Porter, the operation of the Company, the circumstances around his termination, and stockholder concerns. Mr. Diaz said that he did not want to know more details, did not care who was wrong and who was right, and

didn't want to hear more. Mr. Diaz stated he was backing Mr. Porter, wanted Mr. Zaldastani to give up his equity, and wanted Mr. Zaldastani to calm the investors, all without understanding or addressing Mr. Zaldastani's or the stockholders' grievances.

240.    When Mr. Diaz and Mr. Zaldastani could not agree on a price, the meeting ended.

241.    Later, Mr. Diaz was part of the Board decision that voted to intimidate Mr. Zaldastani with an outside legal investigation over his shares and then initiate litigation against Mr. Zaldastani claiming he owned no stock. Mr. Diaz knew those allegations to be wrong since he tried to buy it for himself and had multiple discussions with Mr. Porter about Mr. Zaldastani's equity. Mr. Diaz also ignored information provided to Dentons, then Company counsel, proving Mr. Zaldastani validly owned the shares. Mr. Diaz is self-interested in that he wants the equity owned by Mr. Zaldastani for himself at a discount.

242.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, for the reasons described above, there is no reason to believe that a majority of the Board is disinterested with respect to the claims herein because they face a substantial likelihood of personal liability or that they could have made an independent and disinterested decision to bring the claims herein.

243.    When presented with facts that would require an investigation by a reasonable and prudent Director, the Directors ignored the information, failed to investigate, and used their position on the Board to attempt by coercive means to achieve what they could not achieve through negotiation.

244.    Accordingly, pre-suit demand is excused as futile.

**<u>FIRST CAUSE OF ACTION</u>**
**(FEDERAL SECURITIES FRAUD)**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

245.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

246.    The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

247.    The Defendants did the following while acting individually and collectively in connection with the sale of Company securities:

- employed devises, schemes, and artifices to defraud;

- made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

- engaged in acts, practices, and a course of business that operated as a fraud.

248.    As set forth above, the Defendants disseminated or approved the dissemination of materially false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.

249.    The Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to the true information and facts.

250.    Among the false and misleading statements made to investors are:

- Material misstatements and omissions in the financing documents executed by the Company in connection with the various sales of securities, including, but not limited to, the Schedule of Exceptions to the Series A SPA;

- That the Company would work to make a high value exit, one exceeding $100 million, in 2-4 years from the time of investment;

- That the Company had developed its own intellectual property for key technology and had all licenses, and even exclusivity, to such technology;

- That the Company would have a dedicated software development team which could be sold as part of an enterprise sale of the business;

- That the Company would have a professional management team, including Mr. Zaldastani;

- That the management team would be incentivized through equity to participate in the value creation of the Company;

- That the Company operated in compliance with all laws and that there were no breaches of the legal duties of the officers and directors;

- That the Company had a relationship with Duke University and would honor its commitments to the university; and

- That the Company had technical processes in place to operate its technology and business continuously and without interruption.

All of these representations and statements were false.

251.    Defendants also concealed highly relevant information from Plaintiffs in order to induce the Plaintiffs to purchase securities in the Company.

252.    The concealed facts include:

- That Mr. and Mrs. Porter had previously filed a Chapter 7 bankruptcy;

- That Mr. Porter had various agreements with the Company, executed and approved by no one but himself and his wife, to revoke his licensed intellectual property rights to the Company;

- The actual terms of the license agreements Mr. Porter entered into with the Company;

- The actual compensation to Mr. and Mrs. Porter and their family members, including improper diversion of royalty payments for their personal profit; and

- That key intellectual property was misappropriated from third parties and not properly licensed.

253.    As a result of the Defendants' concealment and making these materially false and misleading statements or permitting them to be made, Plaintiffs reasonably relied upon such statements and invested money, time, and other resources into the Company. Had Plaintiffs knowledge of the true state of affairs, they would not have taken the actions they did.

254.    The Defendants' fraudulent activities have damaged Plaintiffs in an amount to be proven at trial. The actions of the Defendants have reduced the likely sale price of the Company from $100 million to a fraction of that.

255.     The Defendants' conduct was undertaken with malice, oppression, and fraud justifying the imposition of punitive damages on Defendants in an amount sufficient to punish them and deter them and others from engaging in similar behavior in the future.

**SECOND CAUSE OF ACTION**
**(COMMON LAW FRAUD)**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

256.     Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

257.     The Defendants repeatedly made false and misleading statements to third parties to induce them to perform services, invest time and money, and take other actions. Defendants knew such statements were false or misleading. Alternatively, such statements were made with reckless indifference to their truth.

258.     Defendants' false representations were material and important to Plaintiffs when Plaintiffs made decisions to perform services, invest time and money, and take other actions.

259.     Defendants also concealed highly relevant information from the Plaintiffs in order to induce the Plaintiffs to purchase securities in the Company.

260.     As a result of the Defendants' concealment and making these materially false and misleading statements or permitting them to be made, Plaintiffs justifiably relied upon such statements and invested money, time, and other resources into the Company. Had Plaintiffs knowledge of the true state of affairs, they would not have taken the actions they did, including investing and purchasing the Company's securities.

261.     The Defendants' fraudulent activities have damaged Plaintiffs in an amount to be proven at trial.

262.     The Defendants' conduct was undertaken with malice, oppression, and fraud justifying the imposition of punitive damages on Defendants in an amount sufficient to punish them and deter them and others from engaging in similar behavior in the future.

**THIRD CAUSE OF ACTION**
**(NEGLIGENT MISREPRESENTATION)**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

263.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

264.    Defendants' misrepresentations and other promises and statements were made without due care for their accuracy.

265.    As a result of Defendants' false representations of material fact and false promises, Plaintiffs have suffered substantial damage. Had Plaintiffs had knowledge of the true state of affairs, they would not have invested money, time, and other resources into the Company.

266.    These misrepresentations were part of a pattern by Defendants designed to engage in a scheme of deceit and fraud.

267.    As a proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in amounts to be proven at trial.

268.    The Defendants' conduct was undertaken with malice, oppression, and fraud justifying the imposition of punitive damages on Defendants in an amount sufficient to punish them and deter them and others from engaging in similar behavior in the future.

**FOURTH CAUSE OF ACTION**
**(BREACH OF CONTRACT)**
**(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)**

269.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

270.    The Defendants entered into a series of agreements in connection with their investments in the Company. For example, the parties entered into the BrainTap, Inc. Series A Preferred Stock Purchase Agreement and a series of ancillary agreements, including the Investor Rights Agreement, Right of First Refusal and Co-Sale Agreement, and Voting Agreement.

271.    Plaintiffs performed their obligations under these agreements.

272.    Defendants breached their obligations under the agreements by not complying with the terms of the agreements, including but not limited to:

- Not disclosing all information required in connection with the financing;

- Providing false information in the documents, including the Schedule of Exceptions to the Series A Preferred Stock Purchase Agreement;

- Not seeking approval as required for certain corporate actions, including incurring of indebtedness, which requires a separate vote of the Series A Preferred stockholders voting as a separate class;

- Not providing information and required under the agreements; and

- Following the procedures for the election of Directors.

273.    The Company has not had a valid stockholder meeting despite being required to by the Company's governing documents, legal agreements, and Delaware law. The Defendants caused violations of the rights of stockholders, including denying information requests, removing stockholders from stockholder calls, denying the existence of validly issued stock, and attempting to take back equity with no legal basis to do so.

274.    The Defendants' breaches of their agreements have damaged Plaintiffs in an amount to be proven at trial.

**<u>FIFTH CAUSE OF ACTION</u>**
**(BREACH OF FIDUCIARY DUTIES)**
**(BY PLAINTIFFS EXCLUDING DR. MARTIN AGAINST PATRICK PORTER AND CYNTHIA PORTER)**

275.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

276.    Mr. and Mrs. Porter each owe to its stockholders the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

277.    Mr. and Mrs. Porter each violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

278.   The conduct of Mr. and Mrs. Porter set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the stockholders and Company. Mr. and Mrs. Porter intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company and its stockholders.

279.   Mr. and Mrs. Porter breached the duty of loyalty to the stockholders by misappropriating Company assets for personal use.

280.   For example, Mr. and Mrs. Porter misappropriated Company funds for themselves and their relatives through improper use of the royalty payment system and improper expense reports, despite objections from Mr. Zaldastani and the Company's outside accounting and audit firm. They also planned to apply for a U.S. tax research credits, which belonged to BrainTap as a corporate asset, and direct the credits to themselves personally.

281.   Mr. and Mrs. Porter failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby rendering themselves personally liable to the Plaintiffs and Company for breaching their fiduciary duties.

282.   Mr. and Mrs. Porter also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties. Indeed, many of the controls that Mr. Zaldastani tried to impose on the recommendation of the Company's outside professionals were ignored, thwarted, undermined, or even removed entirely.

283.   Mr. and Mrs. Porter had actual or constructive knowledge that the Company issued materially false and misleading statements, which they failed to correct.

284.   Mr. and Mrs. Porter breached their duty of care to the stockholders by engaging in potentially illegal conduct and exposing the Company and themselves to potential civil and criminal liability. Indeed, Mrs. Porter herself insisted on proceeding with an unregistered broker dealer, overriding strong objections about securities law violations from Mr. Zaldastani and Company counsel.

285.    Mr. and Mrs. Porter should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

286.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

287.    Mr. and Mrs. Porter also failed to keep correct books and records, including correct and complete minutes of meetings of the Board. Although the Board discussed and approved many actions, Mr. and Mrs. Porter would later claim that these actions were never approved and documentation either never existed or would disappear. On information and belief, Mrs. Porter, the Company's Secretary, doctored or destroyed minutes and her notes after the fact to hide valid approvals which she and Mr. Porter wished to later deny.

288.    As a direct and proximate result of Mr. and Mrs. Porters' breaches of their fiduciary obligations, Plaintiffs and the Company have sustained and continue to sustain significant damages. As a result of the misconduct alleged herein, Mr. and Mrs. Porter are liable to Plaintiffs and the Company.

**SIXTH CAUSE OF ACTION**
**(MISAPPROPRIATION OF CORPORATE ASSETS)**
**(BY PLAINTIFFS EXCLUDING DR. MARTIN AGAINST PATRICK PORTER AND**
**CYNTHIA PORTER)**

289.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

290.    Mr. and Mrs. Porter owed to the stockholders a duty of loyalty, which prohibits corporate fiduciaries from misappropriating assets entrusted to their management and supervision.

291.    Mr. and Mrs. Porter used their privileged positions as officers and directors to advance their personal and family interests rather than advancing the interests of the Company and its stockholders. For example, Mr. Porter diverted hundreds of thousands of dollars, perhaps millions of dollars, to himself and family members using schemes involving improper reimbursements, charging personal expenses to the Company, and diverting royalty payments to himself and family members for work they did not create.

292.    The self-interested actions of Mr. and Mrs. Porter to misappropriate corporate assets for their personal gain were performed in bad faith.

293.    Mr. and Mrs. Porter's schemes to use corporate assets for personal gain were unrelated to the best interests of the Company.

294.    Mr. and Mrs. Porter further sought to use corporate assets to seek profit for themselves by violating the law.

295.    As a result of the misappropriation of corporate assets, Mr. and Mrs. Porter are each liable to the Plaintiffs and the Company.

296.    Plaintiffs have no adequate remedy at law.

<u>**SEVENTH CAUSE OF ACTION**</u>
**(UNJUST ENRICHMENT)**
**(BY ALL PLAINTIFFS AGAINST PATRICK PORTER AND CYNTHIA PORTER)**

297.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

298.    By their wrongful acts and omissions, Mr. and Mrs. Porter were unjustly enriched at the expense of, and to the detriment of, the Company and its stockholders. No valid justification exists for the actions of Mr. and Mrs. Porter to unjustly enrich themselves and their family members.

299.    Plaintiffs have no adequate remedy at law.

<u>**EIGHTH CAUSE OF ACTION**</u>
**(DECLARATORY RELIEF)**
**(BY PLAINTIFFS EXCLUDING DR. MARTIN AGAINST ALL DEFENDANTS)**

300.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

301.    Defendants failed to remove Mr. Zaldastani from the Board of the Company when they purported to terminate his employment. Specifically, they failed to follow the procedures for removing Directors, which is specified in the Voting Agreement, as well as in the Company's Bylaws.

302.    Because Mr. Zaldastani was never removed, he still holds his director position and all actions taken by the Company and its Board since Mr. Zaldastani's purported termination are null and ultra vires.

303.    An actual controversy has arisen and now exists between Plaintiffs and Defendants regarding the composition of the Company's Board and the validity of corporate action taken since Mr. Zaldastani's termination.

304.    A judicial declaration is necessary and appropriate at this time and under the circumstances in order that the parties may ascertain their respective rights, obligations and duties on a going forward basis.

**NINTH CAUSE OF ACTION**
**(DEFAMATION)**
**(BY MR. ZALDASTANI AGAINST THE COMPANY AND MR. PORTER)**

305.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

306.    On repeated occasions, Mr. Porter and the Company made statements about Mr. Zaldastani that were defamatory.

307.    For example, Mr. Porter made numerous false verbal statements in a December 2022 stockholder call that defamed Mr. Zaldastani. These statements include:

- That Mr. Zaldastani had defrauded the Company during his time as CEO;

- That Mr. Zaldastani was unable to grow the Company;

- That Mr. Zaldastani did not run the Company in the interest of the stockholders;

- That Mr. Zaldastani was "crazy";

- That the Company was profitable before Mr. Zaldastani joined but became unprofitable because of Mr. Zaldastani; and

- That Mr. Zaldastani was responsible for auditing and financial irregularities and problems, requiring a forensic accounting.

308.    By way of further example, the Company sent a written stockholder communication that defamed Mr. Zaldastani. These statements include:

- That Mr. Zaldastani breached his fiduciary duties to stockholders and the Company and failed to manage the Company's affairs properly;

- That Mr. Zaldastani acted without proper corporate approvals and outside the scope of his authority in a manner which materially damaged the Company;

- That Mr. Zaldastani made commitments to Duke University without proper authorization;

- That Mr. Zaldastani was uncooperative by refusing to provide information to the Company's legal counsel;

- That Mr. Zaldastani was placed on a performance plan; and

- That Mr. Zaldastani was responsible himself for the "catastrophic failure" of the Company's app even though Mr. Porter deleted the app and keys himself.

309. Mr. Zaldastani does not yet know the identities of all persons who prepared and approved the dissemination of the written stockholder communication, so it is likely that additional defendants will be added in the future.

310. Mr. Porter made further defamatory statements to third parties concerning Mr. Zaldastani. By way of non-exclusive examples, Mr. Porter stated that Mr. Zaldastani:

- Issued himself his equity in BrainTap secretly and illegally without the knowledge of Mr. and Mrs. Porter;

- That Mr. Zaldastani signed agreements without approval and authority;

- That Mr. Zaldastani defrauded the Company; and

- That Mr. Zaldastani stole corporate funds.

311. Each of the statement described herein were understood by the listeners or readers to be defamatory against Mr. Zaldastani.

312. Mr. Zaldastani suffered injury as a result of these defamatory statements, including injury to his reputation.

313. Many of the statements made by Defendants concerned Mr. Zaldastani's trade or business, namely his ability to operate as professional venture company executive. These

statements were intended to malign Mr. Zaldastani in his trade, business, or profession and did in fact do so.

314.    Some statements imply that Mr. Zaldastani has committed a crime.

315.    The Defendants acted with actual malice in making these false statements, or at least negligently. Defendants knew the statements they made were false or acted with reckless indifference to whether their statements were false.

316.    The Defendants' conduct was undertaken with malice, oppression, and fraud justifying the imposition of punitive damages on Defendants in an amount sufficient to punish them and deter them and others from engaging in similar behavior in the future.

### TENTH CAUSE OF ACTION
### (BREACH OF CONTRACT)
### (BY MR. ZALDASTANI AGAINST BRAINTAP, INC.)

317.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

318.    Mr. Zaldastani had various agreements with BrainTap, Inc. and its predecessor entity, Excel Management which were assumed in connection with its conversion of Excel Management into a Delaware C corporation. By way of non-exclusive example, Mr. Zaldastani had agreements regarding his compensation, reimbursement of expenses, and equity in the Company.

319.    Some of these agreements were written and others verbal, following discussions with the full Board, and confirmed by pattern and practice showing acceptance.

320.    The Company has breached many of its agreements with Mr. Zaldastani. For example, the Company still owes Mr. Zaldastani for his expense reports, which total at least $23,008.33 and failed to pay 93.58 hours of PTO owed to Mr. Zaldastani upon termination. In addition, the Company has made numerous attempts to take Mr. Zaldastani's equity away despite his contractual rights to own this equity.

321.    The Company also breached its agreement that it would not terminate Mr. Zaldastani, but would instead work things out. This agreement altered any "at will" employment relationship with Mr. Zaldastani, to the extent his employment was ever or still was "at will."

322. Mr. Zaldastani performed his obligations under the agreements except for those obligations that he was excused or prevented from performing. Mr. Zaldastani expended significant time and resources and engaged in actions in reliance upon his agreements with the Company.

323. The Defendant's breaches of their agreements have damaged Mr. Zaldastani in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### (PROMISSORY ESTOPPEL)
### (BY MR. ZALDASTANI AGAINST BRAINTAP, INC.)

324. Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

325. Promises were made to Mr. Zaldastani, including, by way of non-exclusive example, regarding equity, compensation, reimbursement of expenses, and the status of his employment.

326. BrainTap made these promises to induce action or forbearance on the part of Mr. Zaldastani.

327. Mr. Zaldastani reasonably expected that the Company would honors its promises and either took actions or forbore actions in reasonable reliance on the promises made, all to his detriment.

328. Injustice against Mr. Zaldastani would result if the promises made to Mr. Zaldastani are not enforced.

329. The Defendant's breaches of their promises have damaged Plaintiff in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION
### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)
### (BY MR. ZALDASTANI AGAINST BRAINTAP, INC.)

330. Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

331.    The agreements between Mr. Zaldastani and the Company included implied covenants of good faith and fair dealing between the parties.  These implied covenants impose a duty upon the Company not to do anything to deprive Mr. Zaldastani of the benefits of the agreements or to engage in any unscrupulous or illegal conduct.

332.    Under the implied covenants in the agreements between Mr. Zaldastani and the Company, the Company had a duty to ensure that Mr. Zaldastani received the benefits of his agreements, including, among other things, the benefits of his stock ownership, reimbursement for his expenses, payment for his unused PTO, and continued employment.

333.    The Company breached the implied covenants by, among other reasons, attempting repeatedly to improperly take Mr. Zaldastani's stock, improperly falsifying his PTO records, failing to reimburse him, terminating his employment, and engaging in the wrongdoing alleged in this Complaint.

334.    The Company's breaches of the implied covenant have damaged Mr. Zaldastani in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)
### (BY MR. ZALDASTANI AGAINST BRAINTAP, INC.)

335.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

336.    By its wrongful acts and omissions, the Company unjustly enriched itself at the expense of, and to the detriment of, Mr. Zaldastani. No valid justification exists for the actions of the Company to unjustly enrich itself at his expense.

337.    The Company's actions have damaged Mr. Zaldastani and unjustly enriched the Company in an amount to be proven at trial.

<u>**FOURTEENTH CAUSE OF ACTION**</u>
**(COMMON LAW FRAUD)**
**(BY MR. ZALDASTANI AGAINST ALL DEFENDANTS)**

338.    Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

339.    The Defendants repeatedly made false and misleading statements to Mr. Zaldastani to induce him to perform services, invest time and money, and take or forbear other actions. Defendants knew such statements were false or misleading. Alternatively, such statements were made with reckless indifference to their truth.

340.    By way of non-exclusive examples, the Defendants promised Mr. Zaldastani:

- That he would have a substantial equity position in BrainTap;

- That he would be allowed to convert guaranteed payments which he never received in preferred stock ownership in the Company;

- That he would not be terminated;

- That he should continue to raise funds because the Company would work things out with him;

- That they wanted to operate the Company as a professional company; and

- That he would have the authority and responsibilities of a CEO of a startup company.

341.    Defendants' false representations were material and important to Mr. Zaldastani when he made decisions to perform services, invest time and money, and take or forbear other actions.

342.    Defendants also concealed highly relevant information from Mr. Zaldastani in order to induce him to perform services, invest time and money, and take or forbear other actions.

343.    By of non-exclusive example, the Defendants concealed from Mr. Zaldastani:

- That Mr. Porter had a side agreement with the Company which permitted him to unilaterally terminate his intellectual property rights licensed to the Company;

- The actual terms of the license agreements Mr. Porter entered into with the Company; and

- That Mr. and Mrs. Porter had previously filed a Chapter 7 bankruptcy.

344. As a result of the Defendants' concealment and making these materially false and misleading statements or permitting them to be made, Mr. Zaldastani justifiably relied upon such statements and invested money, time, and other resources into the Company. Had Mr. Zaldastani knowledge of the true state of affairs, he would not have taken the actions he did.

345. The Defendants' fraudulent activities have damaged Mr. Zaldastani in an amount to be proven at trial.

346. The Defendants' conduct was undertaken with malice, oppression, and fraud justifying the imposition of punitive damages on Defendants in an amount sufficient to punish them and deter them and others from engaging in similar behavior in the future.

## FIFTEENTH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)
### (BY MR. ZALDASTANI AGAINST ALL DEFENDANTS)

347. Plaintiffs repeat and reallege each and every allegation set forth above, as though fully set forth herein.

348. Defendants' misrepresentations and other promises and statements to Mr. Zaldastani were made without due care for their accuracy.

349. As a result of Defendants' false representations of material fact and false promises, Mr. Zaldastani has suffered substantial damage. Had Mr. Zaldastani had knowledge of the true state of affairs, he would not have invested money, time, and other resources into the Company.

350. These misrepresentations were part of a pattern by Defendants designed to engage in a scheme of deceit and fraud.

351. As a proximate result of Defendants' wrongful conduct, Mr. Zaldastani suffered damages in amounts to be proven at trial.

352.    The Defendants' conduct was undertaken with malice, oppression, and fraud justifying the imposition of punitive damages on Defendants in an amount sufficient to punish them and deter them and others from engaging in similar behavior in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    For an award of compensatory damages according to proof;

2.    For an award of restitution, including an order that Defendants disgorge all ill-gotten gains, compensation, and benefits from their conduct alleged herein;

3.    For statutory exemplary damages and punitive damages according to proof;

4.    In the alternative to or in addition to damages, for a right of recission of all investments at the election of the Plaintiffs;

5.    For attorneys' fees and costs of suit incurred herein, including expert fees;

6.    For injunctive relief against Defendants permanently restraining and enjoining them from violating federal and state laws;

7.    For injunctive relief against Defendants permanently restraining and enjoining them from violating their fiduciary duties under law;

8.    For injunctive relief against Defendants permanently restraining and enjoining them from defaming Mr. Zaldastani;

9.    For injunctive relief against Mr. Porter permanently restraining and enjoining him from attempting to terminate his license to the Company;

10.    For a declaration as to the rights, obligations and duties of the parties with respect to Mr. Zaldastani's continued status as a member of the Board of Directors of the Company and invalidity of all Board of Directors actions since his purported termination;

11.    For the appointment of a Receiver or other judicially appointed person to determine the extent of the accounting irregularities and to institute proper procedures and controls; and

12.    For such other and further relief as the Court deems just and proper.

**GREENBERG TRAURIG, LLP**

OF COUNSEL:

David Frazee
Frazee Legal
372 E. Torino Ave.
Las Vegas, Nevada 89123
david@frazeelegal.com

Dated:  December 16, 2024

*/s/ Lisa M. Zwally*
Lisa M. Zwally (DE Bar #4328)
Greenberg Traurig, LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
(302) 661-7000
Lisa.Zwally@gtlaw.com

*Attorneys for Plaintiffs Nicholas Zaldastani, Chen Joint Revocable Trust, Xiang Ming Chen, Kevin Phillips, Lu & Li Trust, Salman Azhar, Kristin Spindler, Thomas Espy, French Road, LLC, Silicon Hill Private Investments, LLC, Victoria Dauphinot, and David Martin*

ADMIN 698722392v1