IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NICHOLAS ZALDASTANI, et al.,<br>Plaintiffs,<br>v.<br>BRAINTAP, INC., et al.,<br>Defendants. | CIVIL ACTION<br>NO. 24-1380 |

**OPINION**

**Slomsky, J.** **September 24, 2026**

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 2

II. BACKGROUND .......... 4

A. Factual Background .......... 4

1. Parties .......... 4
2. Conversion into BrainTap, Inc. & Execution of Stock Purchase Agreement .......... 5
3. Mr. Porter's License Agreement .......... 6
4. Misappropriation of Intellectual Property .......... 9
5. Porters' Concealed Bankruptcy .......... 11
6. Self-Dealing, Removal of Financial Controls, & Nepotism .......... 11
7. Termination of Zaldastani & Dr. Martin's SAFE Investment .......... 13
8. Destruction of Company Technology .......... 14

B. Procedural Background .......... 14

III. STANDARD OF REVIEW .......... 15

IV. ANALYSIS .......... 16

A. Count One Will Be Dismissed for Failure to Plausibly Allege Violations of Federal Securities Law. .......... 17

1. Federal Securities Fraud Standard .......... 17

2. Omission of Termination Provisions of 2016 License Agreement .......... 18

3. Misstatements Regarding Intellectual Property Ownership .......... 27

4. Omission of Porters' Bankruptcy .......... 29

5. Intention to Terminate Zaldastani .......... 31

6. Intention to Raise Series B Financing .......... 32

B. Counts Two Through Ten Will Be Dismissed Because All Claims over Which the Court Had Original Jurisdiction Are Being Dismissed. .......... 34

V. CONCLUSION .......... 36

## I. INTRODUCTION

Before the Court are two separate Motions to Dismiss brought by Defendants Cynthia and Patrick Porter (together, the "Porters") and BrainTap, Inc. (the "Company") (collectively with the Porters, "Defendants") to dismiss the Plaintiffs' Amended Complaint. (Doc. Nos. 54, 55.) The Porters founded the Company, which operates a cell phone application that provides drug-free therapies to treat mental and physical health conditions. (Doc. No. 49 ¶¶ 1, 182.) Plaintiffs are investors in the Company who own over 60% of the shares not owned by the Porters.[1] (Id. ¶ 3.)

[1] Plaintiffs include Nicholas Zaldastani; Xiang Ming Chen, as Trustee of Chen Joint Revocable Trust; Xiang Ming Chen, individually; Kevin Phillips; Hua Lu, as Trustee of Lu & Li Trust; Salman Azhar; Kristin Spindler; Thomas Espy; French Road, LLC; Sand Hill Private Investments, LLC; Victoria Dauphinot; David Martin; Larry Silverstein; Greg Gall; Kumar Shivdasani; Sean Hsieh; and Dinesh Gauba. (Doc. No. 49 at 4–8.)

Among the Plaintiffs are Nicholas Zaldastani ("Zaldastani"), former Chief Executive Officer (CEO) and Director of the Company, and David Martin ("Dr. Martin"), an investor in the Company. (Id. at 4, 7.) In this case, Plaintiffs assert several claims against Defendants, set forth in ten (10) Counts:

- Count One: Federal Securities Fraud Against all Defendants
- Count Two: Common Law Fraud Against all Defendants
- Count Three: Negligent Misrepresentation Against all Defendants
- Count Four: Breach of Contract Against BrainTap, Inc.
- Count Five: Breach of Fiduciary Duties Against the Porters
- Count Six: Misappropriation of Corporate Assets Against the Porters
- Count Seven: Unjust Enrichment Against the Porters
- Count Eight: Breach of Contract Against BrainTap, Inc.
- Count Nine: Breach of Covenant of Good Faith and Fair Dealing Against BrainTap, Inc.
- Count Ten: Unjust Enrichment Against BrainTap, Inc.

(Doc. No. 49.)[2]

---

[2] Plaintiffs bring both derivative and direct claims against Defendants. (See Doc. No. 49.) A derivative claim "enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation." Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1036 (Del. 2004). Because the derivative claim is brought on the corporation's behalf, any recovery goes to the corporation instead of the shareholders. Id. By contrast, a direct claim alleges injury to shareholders' legal interests, with recovery going directly to the shareholders. Id.

Counts One through Three are direct actions brought by all Plaintiffs against all Defendants. (See Doc. No. 49.) Count Four is a direct action brought by all Plaintiffs except Dr. Martin against Defendant BrainTap, Inc. (See id.) Counts Five through Seven are derivative actions brought by all Plaintiffs except Dr. Martin against the Porters. (See id.) Counts Eight through Ten are direct actions brought by only Plaintiff Zaldastani against Defendant BrainTap, Inc. (See id.)

For the following reasons, Defendants' Motions to Dismiss (Doc. Nos. 54, 55) will be granted only on Count One, the Federal Securities Fraud Count. Because this is the only Count giving this Court original jurisdiction and it is being dismissed, the Court will decline to exercise supplemental jurisdiction over the remaining Counts, which allege state law claims. As such, the Court will dismiss Counts Two through Ten with leave to re-file those claims in state court.

## II. BACKGROUND

### A. Factual Background

#### 1. Parties

Defendant BrainTap, Inc. (the "Company") is a Delaware corporation that offers non-invasive drug-free technology-enabled therapies to help users improve mental clarity, reduce stress and anxiety, and help with conditions such as insomnia, chronic pain, Post-Traumatic Stress Disorder, and addiction.[3] (Doc. No. 49 ¶¶ 1, 29.) Defendant Patrick Porter is the Company's current Chief Executive Officer (CEO), Treasurer, and a Director on the Company's Board of Directors. (Id. ¶ 30.) Defendant Cynthia Porter, Mr. Porter's wife, is the Company's Chief Marketing Officer (CMO), Secretary, and Chairperson of the Company's Board of Directors. (Id. ¶ 32.) At all relevant times, the Porters held two-thirds of the Board's seats and "effectively held absolute control over all major corporate actions of the Company." (Id. ¶ 34.) As officers and

---

[3] The Company is sued as both a direct and nominal defendant. (Doc. No. 49 ¶ 29.) A direct party is often referred to as a "real party in interest," as the party possesses "enforceable rights and duties under substantive law." Gimaex Holding, Inc. v. Spartan Motors USA, Inc., No. 15-515, 2015 WL 5968117, at *5 (D. Del. Oct. 14, 2015). By contrast, a nominal party is one "without a real interest in the litigation." Bumberger v. Ins. Co. of North Am., 952 F.2d 764, 767 (3d Cir. 1991). Where a shareholder asserts a derivative claim on a corporation's behalf, the corporation is a direct party because "[t]he proceeds of the action belong to the corporation and it is bound by the result of the suit." Ross v. Bernhard, 396 U.S. 531, 538–39 (1970).

directors of the Company, the Porters owed shareholders fiduciary duties of good faith, loyalty, and candor. (Id. ¶¶ 35–36.)

Plaintiffs are investors who together hold over 60% of the Company's outstanding disinterested stock. (Id. ¶ 3.) All Plaintiffs except Dr. Martin received Series A Preferred Stock in the Company pursuant to a Stock Purchase Agreement ("SPA") executed in April 2021. (Id. ¶¶ 10–27.) Plaintiff Nicholas Zaldastani is the Company's former CEO and Chairman of the Board, and the largest stockholder outside the Porters. (Id. ¶ 3.) In October 2022, Plaintiff Dr. Martin invested $25,000 in a Simple Agreement for Future Equity ("SAFE")–a financial instrument that conditions the issuance of equity in a company on a future event. (Id. ¶¶ 22, 178.)

### 2. Conversion into BrainTap, Inc. & Execution of Stock Purchase Agreement

Prior to April 2021, BrainTap legally operated as Excel Management, LLC ("Excel Management"), a South Dakota limited liability company. (Id. ¶ 42.) Before 2016, Excel Management was owned entirely by the Porters, who operated it as a "mom & pop" business. (Id. ¶ 43.) In time, however, the Porters wanted to convert Excel Management from a "mom & pop" shop to a publicly owned company that could be acquired for value. (See id. ¶ 50.) With these goals in mind, the Porters recruited Zaldastani to modernize the Company, raise capital from angel and venture investors,[4] and position the Company for acquisition at a valuation exceeding $100 million. (Id. ¶¶ 45, 48, 50.) In May 2016, Zaldastani joined Excel Management as Chairman of the Board of Directors and would later become CEO. (Id. ¶¶ 48, 55.)

[4] An angel investor provides initial funding to a business startup. A venture investor provides funding to early-stage companies with strong chances of growth. Many Plaintiffs in this case identify as angel and venture investors who invested in the Company as a start-up. (Doc. No. 49 ¶ 4.)

In March 2021, Excel Management began the process of converting to BrainTap, Inc., a Delaware C corporation. (Id. ¶¶ 65, 67.) On March 16, 2021, as part of the conversion process, the company issued Common Stock to Zaldastani and the Porters in proportion to their equity interests in Excel Management. (Id. ¶ 69.)

In April 2021, just after Excel Management completed its legal conversion to BrainTap, Inc., the Company executed a Series A Preferred Stock Purchase Agreement (the "SPA"), by which all Plaintiffs except for Dr. Martin received Series A Preferred Stock in the Company. (Id. ¶¶ 10–27, 96.) As a result of the SPA, the Porters' ownership interest in the Company decreased to less than 50%. (Id. ¶ 88.) The SPA contains "a series of representations and warranties," which are required to "disclose the key terms of any agreement . . . , encumbrance, restriction, or unusual term of any . . . agreement." (Id. ¶ 96.) The SPA was accompanied by a Disclosure Schedule (the "Disclosure Schedule"), which purportedly "describe[s] in detail all facts and side agreements which could have an adverse effect on the business." (Id. ¶ 97.) The representations and warranties in the SPA and accompanying Disclosure Schedule underpin most of Plaintiffs' claims, to be discussed infra.

**3. Mr. Porter's License Agreement**

A significant portion of the Company's value is in the rights to its content library, much of which was allegedly developed by Patrick Porter.[5] (Id. ¶ 80.) As such, the Company has executed license agreements governing the use of its intellectual property and the provision of royalties to Patrick Porter. (Id. ¶¶ 79, 81.) In approximately May 2016, Patrick Porter verbally represented to Zaldastani that his license agreement with the Company had "the same standard terms as other licensors." (Id. ¶ 82.) On May 17, 2016, Cynthia Porter sent Zaldastani by email a license

[5] Plaintiffs dispute that Patrick Porter developed the Company's intellectual property. (See Doc. No. 49 ¶ 110.) These claims are discussed infra.

agreement, which was represented to be the current and correct license agreement between the Company and Patrick Porter. (Id.) The relevant terms of the agreement sent by Cynthia Porter (the "2014 License Agreement") provide:

> This Agreement shall be subject to termination at the election of LICENSOR, by written notice to LICENSEE, where there has been default in the due observance of performance of any material covenant, quality standard, condition or agreement herein by LICENSEE (as determined by LICENSOR) and such default has been continued for a period of fifteen (15) calendar days after written notice, specifying the event of default, has been given to LICENSEE.

(Doc. No. 49-1, Ex. F) (2014 License Agreement at § 3.2.) On June 27, 2016, Cynthia Porter by email sent the same document to an outside licensing advisor and represented that the document was Mr. Porter's "current licensing agreement with the Company." (Id. ¶ 83.) Zaldastani and Mr. Porter were copied on this email. (Id.)

During this litigation, however, Company counsel produced a different document: a "Copyright License Agreement" dated March 24, 2016 (the "2016 License Agreement"), a date before both emails sent by Cynthia Porter. (Id. ¶¶ 85–86.) The relevant terms of the 2016 License Agreement provide:

> 8.1 Termination by Licensor. Company shall be deemed in default under this Agreement, and all rights granted to Company herein shall automatically terminate upon written notice to Company, upon occurrence of any of the events specified in Subsection 8.1(a) and (b) below.
>
> …
>
> (b) Change of Control and Material Breach of Agreement. This Agreement shall be subject to termination upon written notice by Licensor to Company if, at any time, Patrick K. Porter and Cynthia Porter together hold less than Fifty Percent (50%) of the total outstanding membership interest in Company and either: (i) Company fails to pay the License Fee required under Section 1.2 above, or (ii) Company breaches Section 1.4 hereof regarding the restrictions on Company's use of the Material.

(Doc. No. 49-1, Ex. H) (2016 License Agreement at § 8.1.) Unlike the 2014 License Agreement,

the 2016 License Agreement contains the additional restriction that Mr. Porter may only terminate his license if the Porters' ownership in the Company dips below 50%. (Doc. No. 49 ¶ 87.)

For every Plaintiff other than Zaldastani, this litigation was the first time the Company provided a copy of the 2016 License Agreement.[6] (Id. ¶ 85.) Plaintiffs allege investors did not have access to the 2016 License Agreement when the SPA was executed in April 2021 or during any subsequent investments. (See id. ¶ 92.) While the SPA's Disclosure Schedule listed the existence of a license agreement, it "did not describe any of its terms and did not disclose any right to terminate based upon minority ownership or otherwise." (Id. ¶ 100.) The Disclosure Schedule provides:

> This Disclosure Schedule includes brief descriptions or summaries of certain agreements and instruments, copies of which are available upon reasonable request. Such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided to the Purchasers of their respective counsel.

(Doc. No. 49-1, Ex. C.) While the Company provided investors with online access to documents listed in the Disclosure Schedule, the online document rooms "did not contain any of the licensing documents." (Id. ¶ 92.) Furthermore, neither Porter "ever verbally corrected the misrepresentations made by Mrs. Porter about the Disclosed License Agreement." (Id. ¶¶ 92, 94.)

After the circulation of the Disclosure Schedule, many investors asked Zaldastani, the CEO at the time, about the terms of Patrick Porter's license agreements. (Id. ¶ 104.) Zaldastani brought these questions to Mr. Porter, who reiterated that the terms were standard and that Zaldastani already had a copy of the license agreement. (Id.) Zaldastani then repeated that the license

---

[6] Given the novelty of this disclosure, Plaintiffs argue, in the alternative, that the 2016 License Agreement was either fraudulently concealed or fabricated and backdated. (Id. ¶ 86.)

agreement was "standard" to investors, who relied upon his representations when making their decisions to invest in the Company. (Id. ¶¶ 104–06.)

After his termination in October 2022, Zaldastani confronted Patrick Porter about the concealment of the license agreement's true terms. (Id. ¶ 90.) In response, Mr. Porter stated he "can take back [his] license at any time," that he could "bankrupt the Company and take his intellectual property and start a new company at any time," and "that no one could do anything about it." (Id. ¶ 90.)

The Amended Complaint alleges "[n]one of the Plaintiffs would have invested in BrainTap if they knew that the Company's rights to most of its intellectual property were tenuous and potentially revocable." (Id. ¶ 107.) In particular, Plaintiffs emphasize Mr. Porter's right to terminate upon minority ownership in the 2016 License Agreement. (See id. ¶ 87.) The SPA's execution caused the Porters to hold less than 50% ownership in the Company, meaning Mr. Porter could seemingly terminate the license under the 2016 Copyright License Agreement right after most Plaintiffs made their investment. (Id. ¶ 88.) Consequently, Plaintiffs allege that "[n]o investor, knowing the Porters were about to go below 50% ownership would want to risk a potential termination by Mr. Porter of the majority of the Company's library of content." (Id.)

#### 4. Misappropriation of Intellectual Property

From at least 2017 through late 2022, Patrick Porter represented to investors that he developed the insights and technology behind the Company's NeuralChek product. (Id. ¶ 111.) Instead, Plaintiffs allege Mr. Porter appropriated the idea from another party, who had developed the underlying intellectual property and contracted with a Russian company to build it. (Id. ¶ 112.) With knowledge of the developers' contract with the Russian company, Mr. Porter allegedly "went around" the developers to the Russian company directly and misappropriated the NeuralChek technology. (Id. ¶¶ 112–13.)

In addition, Mr. Porter represented that he had an "exclusive license" to use the technology worldwide. (Id. ¶ 115.) However, Plaintiffs claim other parties held and exercised distribution rights to the technology in the United States and worldwide, indicating no attempt by the Company to license its technology internationally. (Id. ¶¶ 115–16.) In fact, the Amended Complaint alleges the NeuralChek product "would still need a license" from the original developers for the Company to use it in the U.S.A. (Id. ¶ 118.)

Plaintiffs allege none of these facts were disclosed to any investor, in the SPA or otherwise. (Id. ¶ 117.) The relevant section of the SPA provides:

> (a) The Company owns, possesses or believes it can acquire on commercially reasonable terms sufficient legal rights to all Company Intellectual Property without any conflict with, or infringement of, the rights of others, including prior employees or consultants. The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person, and the Company does not have any specific reason to believe that such an allegation may be forthcoming.
>
> (b) To the Company's knowledge, no product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any Intellectual Property Rights of any other party.
>
> …
>
> (d) Other than with respect to commercially available software products under standard end-user object code license agreements, cloud services under standard end-user license agreements, backup licenses from employees and contractors granted in connection with providing services to the Company and open source licenses, the Company is not bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property Rights of any other Person.
>
> (e) The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the Intellectual Property Rights of any other Person.

(Doc. No. 49-1, Ex. I § 2.8.)

Because a substantial portion of the Company's value is in its intellectual property, Plaintiffs allege they relied on Mr. Porter's statements about intellectual property ownership when deciding to invest in the Company. (Doc. No. 49 ¶ 114.) According to the Amended Complaint, the lack of intellectual property ownership could result in the Company "be[ing] sued for injunctive relief by third party right holders, which would cause a material adverse effect on the Company's operations and ability to sell and operates [sic] its products and services." (Id. ¶ 110.)

**5. Porters' Concealed Bankruptcy**

The Porters had previously filed a Chapter 7 bankruptcy, which was not disclosed to Plaintiffs at the time of their investments. (Id. ¶ 138.) The SPA represents that, to the Company's knowledge, none of the Key Employees or directors of the Company had been "subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law." (Id. ¶ 139.) The SPA defines "knowledge" as:

> (g) "Knowledge" including the phrase "to the Company's knowledge" shall mean the actual knowledge after reasonable investigation of Nicholas Zaldastani and Patrick K. Porter, Ph.D.

(Doc. No. 49-1, Ex. I § 1.6(g).)

Despite this representation in the SPA, Plaintiffs first learned of the bankruptcy during this litigation. (Id. ¶ 140.) Plaintiffs argue they "would not have invested millions of dollars" in the Company had they known of the prior bankruptcy, as those with a "history of financial mismanagement" like the Porters "are . . . more likely to engage in habits and practices that result in the misuse of funds they have access to. . ." (Id.)

**6. Self-Dealing, Removal of Financial Controls, & Nepotism**

In addition to the concealed bankruptcy, Plaintiffs emphasize other facts indicating poor financial management, leading to a decline in the Company's value. First, Plaintiffs allege Patrick

Porter engaged in self-dealing by improperly attributing to himself royalty payments on the Company's intellectual property. (Id. ¶ 119.) As part of its model, the Company pays royalty payments to those who create content for its application. (Id. ¶ 120.) Plaintiffs allege Mr. Porter tagged himself as an authorized royalty recipient on hundreds of tracks in the Company's library that he did not produce, including tracks created by a creator who died and tracks belonging to the Company. (Id. ¶ 121.) This conduct cost the Company "hundreds of thousands of dollars, possibly millions of dollars," in "precious assets needed to grow and expand the business." (Id. ¶ 122.)

Royalty payments also flowed to family members without oversight. For example, Patrick Porter's brother received $6,000 per month, of which the outside accountants could justify "approximately 1/6," describing the rest as "some kind of backdoor deal" and speculating about "potential criminal liability." (Id. ¶ 149.) According to Plaintiffs, the royalty system "operated as a family 'slush fund.'" (Id. ¶ 150.)

Second, Plaintiffs allege Defendants failed to implement financial controls within the Company, causing the Company's value to decline. In May 2021, Zaldastani warned Mr. Porter in writing that his self-payments were "a big red flag," that "[i]f [the accounting firm] had not caught this, this would have been an audit disaster," and that "[s]elf dealing is very dangerous." (Id. ¶ 130.) Mr. Porter responded: "I can write a check anytime." (Id. ¶ 131.) When Zaldastani attempted to implement controls, Mr. Porter wrote: "Don't treat me like a staff person . . . You reimburse and then we work out the details." (Id. ¶ 133.) An outside accounting firm separately warned management in writing that the Porters' personal charges on the Company credit cards risked "not only severe tax implications, but also a misrepresentation of the health of the business." (Id. ¶ 132.) On July 23, 2022, Mr. Porter gave himself full administrative read-and-write access

to the Company's QuickBooks account, prompting the outside accountants to warn that they "would be unable to stand behind" the Company's financial statements. (Id. ¶ 134.)

Third, Plaintiffs allege the Porters used the Company to "support various family members who were largely unqualified to hold the positions they occupied." (Id. ¶ 143.) These family members included Mr. Porter's brother, who "engaged in tax fraud during his employment," and Mr. Porter's sister, who was unqualified to serve as the Company's accountant. (Id. ¶¶ 144–45.) Plaintiffs allege employing these individuals caused the Company financial harm, leading to a decline in the value of their investment. (See id.)

**7. Termination of Zaldastani & Dr. Martin's SAFE Investment**

In 2022, tensions escalated between Zaldastani and the Porters. (Id. ¶ 172.) Zaldastani attempted to halt fund-raising pending resolution of these issues. (Id. ¶ 175.) On October 12, 2022, in response to Zaldastani's concerns, Patrick Porter wrote to Zaldastani, "continue your fund raising. We will continue to work out the rest as we go." (Id.) On those reassurances, Zaldastani closed further investments for the Company. (Id.)

According to Plaintiffs, Mr. Porter's email to Zaldastani was "false when [it was] made," as the Porters were already taking affirmative steps to terminate Zaldastani. (Id. ¶ 176.) Congruent with this allegation, Zaldastani was terminated on October 27, 2022, two weeks after Mr. Porter's email was sent. (Id.) The Amended Complaint states, "Mr. Porter . . . did not want the fundraising to stop and deceived Mr. Zaldastani to induce him to continue fundraising." (Id.)

Plaintiffs allege many investors were "connected to Mr. Zaldastani," and "invested on the understanding Mr. Zaldastani was the CEO and that there were no facts or circumstances that would change this situation." (Id. ¶ 177.) One such investor was Dr. Martin. To raise capital, the Company had approved the issuance in 2022 of Simple Agreements for Future Equity ("SAFEs"), which are a type of convertible security. (Id. ¶ 205.) The Company had promised investors the

SAFEs would convert into Series B Preferred Stock and that the Company would "diligently pursue that financing." (Id.) On October 24, 2022, Dr. Martin invested $25,000 in a SAFE based on these promises and his belief in Zaldastani's leadership as CEO. (Id. ¶ 178.) After the Porters terminated Zaldastani, Dr. Martin demanded the return of his investment in writing multiple times, all of which Mr. Porter refused. (Id.)

After Zaldastani's termination, the Company "made no serious attempt" to pursue Series B financing. (Id. ¶ 206.) The Amended Complaint alleges the Porters "never had any intention of pursuing further venture financings," and instead "used Mr. Zaldastani to raise money, knowing they planned to terminate him." (Id. ¶¶ 207–08.)

**8. Destruction of Company Technology**

Following Zaldastani's termination, Patrick Porter ended the Company's relationship with its outsourced technology team, effectively terminating six dedicated software engineers, "destroying value and continuity of technology support," and "significantly reduc[ing] the Company's acquisition value." (Id. ¶ 181.) Mr. Porter then personally logged into the Company's Amazon Web Services ("AWS") account, deleted the Company's only working app, and killed the AWS keys. (Id. ¶ 182.) While the app has since been reprogrammed and restored, Plaintiffs allege that "the Company's reputation suffered greatly" from this event, and that "the deletion of the existing app caused damage to the Company's value." (Id. ¶¶ 185–86.)

**B. Procedural Background**

On September 4, 2025, Plaintiffs filed the Amended Complaint. (Doc. No. 49.) On October 3, 2025, the Porters and BrainTap, Inc. filed their Motions to Dismiss. (Doc. Nos. 54, 55.) After numerous stipulations to extend time for Plaintiffs to respond to the Motions to Dismiss, the Court held a status conference with the parties on June 9, 2026. On June 11, 2026, Plaintiffs filed their Reponses in Opposition to Defendants' Motions to Dismiss. (Doc. Nos. 76, 77.) On

June 26, 2026, Defendants filed their Replies. (Doc. Nos. 83, 84.) On July 27, 2026, the Court held a hearing on the Motions to Dismiss.

The Motions to Dismiss (Doc. Nos. 54, 55) are now ripe for disposition.

## III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234–35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. ANALYSIS

In support of their Motions to Dismiss (Doc. Nos. 54, 55), Defendants argue, among other things, that Plaintiffs fail to state a claim upon which relief can be granted under Section 10(b) of the Securities and Exchange Act and Rule 10b–5. (Doc. Nos. 56 at 14–17, 57 at 5–14.) For the reasons that follow, this Court will dismiss Count One of Plaintiffs' Amended Complaint, the Federal Securities Fraud claim. Because Count One contains the only claim giving this Court original jurisdiction and it is being dismissed, this Court will decline to exercise supplemental jurisdiction over Counts Two through Ten and will dismiss those Counts without prejudice.

### A. Count One Will Be Dismissed for Failure to Plausibly Allege Violations of Federal Securities Law.

#### 1. Federal Securities Fraud Standard

In Count One, Plaintiffs allege a violation of the Securities and Exchange Act and Rule 10b–5. Section 10(b) of the Act provides that it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security. . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the SEC, makes it unlawful for a person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading . . . in connection with the purchase or sale of any security."[7] 17 C.F.R. § 240.10b–5(b) ("Rule 10b–5").

Thus, to state a claim under Rule 10b–5, a plaintiff must plausibly allege the following elements:

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection between the misstatement and the purchase or sale of a security;

(4) reliance upon the misstatement;

(5) economic loss; and

(6) causation.

See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005); see also Fan v. StoneMor Partners LP, 927 F.3d 710, 714 (3d Cir. 2019).

[7] "Together, [Section] 10(b) and Rule 10b–5 imply a private cause of action for securities fraud." City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc., 70 F.4th 668, 679 (3d. Cir. 2023). In this Opinion, for purposes of clarity, the securities fraud claim will be referred to as a Rule 10b–5 claim.

Rule 10b–5 claims have heightened pleading requirements. Namely, in the Private Securities Litigation Reform Act ("PSLRA"), Congress raised the pleading standards for the first two elements: material misrepresentation and scienter. Concerning a material misrepresentation or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Turning to scienter, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2)(A).

Here, in Count One, Plaintiffs allege five (5) categories of omissions or misstatements by Defendants that violate Rule 10b–5. (Doc. No. 49.) The Court will address each category of omissions or misstatements in turn.

**2. Omission of Termination Provisions of 2016 License Agreement**

To begin, Plaintiffs claim none of the investors would have invested in the Company if they had been aware of Patrick Porter's termination rights under the 2016 License Agreement. (Id. ¶ 95.) Unlike the 2014 License Agreement, the 2016 License Agreement permitted Mr. Porter to terminate his license with BrainTap after the Porters' equity interest in the Company dipped below 50%. (Id. ¶ 87.) According to Plaintiffs, only the License Agreement's existence, not its termination provisions, was disclosed in the Disclosure Schedule to the Stock Purchase Agreement ("SPA"). (Id. ¶ 100.) The Disclosure Schedule provides, in relevant part:

> This Disclosure Schedule includes brief descriptions or summaries of certain agreements and instruments, copies of which are available upon reasonable request. Such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided to the Purchasers of their respective counsel.

(Doc. No. 49-1, Ex. J.)

After the Disclosure Schedule was circulated, many Company investors asked Zaldastani, in his capacity as CEO, about the terms of Patrick Porter's License Agreement. (Doc. No. 49 ¶ 104.) At the time, Zaldastani believed the 2014 License Agreement was in effect because Cynthia Porter had sent him that agreement by email on two occasions. (Id. ¶¶ 82–83.) Additionally, Patrick Porter had represented to Zaldastani that the agreement's terms were "standard." (Id. ¶ 104.) Therefore, in response to the investors' inquiries, Zaldastani represented that the terms were "standard." (Id.) Plaintiffs allege they would not have invested in the Company had they known the Company's intellectual property rights were "tenuous and potentially revocable," because the 2016 License Agreement permitted Mr. Porter to terminate the Company's license upon the Porters having only minority ownership of the Company. (Id. ¶ 107.)

In response, Defendants argue the alleged omission of the 2016 License Agreement's termination provisions do not support a Rule 10b–5 claim because the following elements were not adequately pled: (a) a material misrepresentation; (b) scienter; (c) reasonable reliance; and (d) causation.[8] (Doc. No. 57 at 7–10.) The Court will address each disputed element in turn.

**a. Material Misrepresentation**

Defendants argue that Plaintiffs fail to allege a material misrepresentation occurred. This is the first element of a Rule 10b–5 violation. Dura Pharms., 522 U.S. at 341–42. In support, Defendants emphasize two facts. First, the 2016 License Agreement was disclosed to Zaldastani prior to the execution of the SPA in 2021. (Doc. No. 57 at 9.) Second, the 2016 License Agreement was referenced and available to Plaintiffs in the Disclosure Schedule. (Id.)

---

[8] Defendants also allege that the misstatements regarding the license agreement were not made in connection with the purchase or sale of a security, as is required by the Third Circuit. (Doc. No. 57 at 8.) Because the Court finds the other elements of Rule 10b–5 to be inadequately plead, it is unnecessary to address this argument.

In opposition, Plaintiffs argue Zaldastani reasonably believed the 2014 License Agreement to be the one in effect based on Cynthia Porter's emails and Patrick Porter's verbal representations. (Doc. No. 49 ¶ 106.) Regarding the reference to the License Agreement in the Disclosure Schedule, Plaintiffs emphasize that only the Agreement's existence–not its terms–was disclosed. (Id. ¶ 100.) Plaintiffs characterize Defendants' disclosure of the License Agreement's existence, without disclosing Mr. Porter's "right to terminate based upon minority ownership," as a "half-truth" violating Rule 10b–5. (Doc. No. 76 at 14.)

Rule 10b–5 makes it unlawful to "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5(b). The Supreme Court of the United States has recognized that this language applies only to half-truths, and not pure omissions. Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 263–64 (2024). Outlining the distinction between pure omissions and half-truths, the Supreme Court explained:

> A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence. . . . Half-truths, on the other hand, are representations that state the truth only so far as it goes, while omitting critical qualifying information.
>
> Rule 10b–5(b) does not proscribe pure omissions. The Rule prohibits omitting material facts necessary to make the statements made . . . not misleading. Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete (i.e., that the dessert was, in fact, a whole cake). This Rule therefore covers half-truths, not pure omissions. Logically and by its plain text, the Rule requires identifying affirmative assertions (i.e., "statements made") before determining if other facts are needed to make those statements not misleading. . . . It once again bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.

601 U.S. 257, 263–64 (2024) (quotations and citations omitted).

Here, Plaintiffs incorrectly characterize the omission of Mr. Porter's termination right as a half-truth. Instead, the 2016 License Agreement was either disclosed or available to all Plaintiffs.

First, the parties do not dispute that Zaldastani received the 2016 License Agreement prior to the SPA's execution. (Doc. No. 57 at 9.) Although Plaintiffs allege Zaldastani operated under a mistaken belief that the 2014 License Agreement was the current agreement, this argument is unpersuasive. Zaldastani, in his position as CEO of the Company, had constructive knowledge of the terms within the 2016 License Agreement because he received a copy. See IFM Therapeutics, Inc. v. Lycera Corp., No. 17-608-LPS, 2018 U.S. Dist. LEXIS 150462, at *22–23 (D. Del. Aug. 31, 2018) ("Constructive knowledge is the '[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person.'") (citing Goldman, Sachs & Co. v. Athena Venture Partners, L.P., 803 F.3d 144, 148 (3d Cir. 2015)). Furthermore, even if Zaldastani had not received the 2016 License Agreement, the terms of the two agreements are not materially different. While the 2016 License Agreement permitted Mr. Porter to terminate upon (a) minority ownership and (b) a breach, the 2014 License Agreement permitted Mr. Porter to terminate whenever a breach occurred, regardless of his ownership in the Company. If Zaldastani were to describe the 2014 License Agreement "standard," he would deem the more restrictive 2016 License Agreement "standard" as well. Zaldastani's belief that the 2014 License Agreement was current, therefore, has little significance. Accordingly, no material omission or misrepresentation occurred with respect to Zaldastani.

Second, regarding the remaining Plaintiffs, the Disclosure Schedule contains no "half-truths" rendering its representations misleading. As shown above, the Disclosure Schedule identified the License Agreement, stated that copies were available upon reasonable request, and expressly provided in the Preamble that its descriptions were not comprehensive and were

qualified by the underlying documents.[9] (See Doc. No. 49-1 Ex. J.) With copies of the 2016 License Agreement available, no omission or misstatement occurred.

Thus, accepting Plaintiffs' allegations as true, the facts demonstrate disclosure of the 2016 License Agreement and an avenue for obtaining its terms, not a misleading representation or concealment of those terms. Therefore, Plaintiffs have failed to plead the first element of their Rule 10b–5 claim.

**b. Scienter**

Defendants also argue that scienter, the second element of a Rule 10b–5 claim, was not pled with the requisite specificity. (Doc. Nos. 56 at 14–15, 57 at 8–9.) Specifically, Defendants argue Cynthia Porter's attachment of the 2014 License Agreement in her emails to Zaldastani in May and June of 2016 constituted inadvertent mistakes, instead of intentional fraud. (Doc. No. 57 at 8–9.) In response, Plaintiffs contend the actionable misrepresentation did not occur with Cynthia Porters' emails, but with the Company's statements in connection with the sale of securities. (Doc. No. 76 at 13–14.) In particular, Plaintiffs allege the "Porters knew the Company was selling notes, Series A Preferred Stock, and SAFEs from 2017 through late 2022" on the investors' mistaken assumption that the License Agreement had "standard" terms. (Id. at 14.)

The PSLRA requires Plaintiffs to plead with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A); Institutional Invs.

---

[9] Regarding the language in the Disclosure Schedule's Preamble that copies of the License Agreement are "available upon reasonable request," Plaintiffs point to other language appearing in the Preamble: "true and complete copies of which have been provided to the Purchasers or their respective counsel." (Doc. Nos. 49-1 Ex. J., 76 at 14.) Plaintiffs state this language was "false" because "[n]o copies were provided to them, the data rooms contained no licensing documents, and they first received the agreement in this litigation." (Doc. No. 76 at 14.) This argument is unpersuasive. The Disclosure Schedule explicitly provided Plaintiffs the opportunity to request such documents. If Plaintiffs found such documents had not been provided, Plaintiffs had the opportunity to contact the Company and receive a copy themselves.

Grp. v. Avaya, Inc., 564 F.3d 242, 252, 267 (3d Cir. 2009). Those facts will suffice "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007). "[C]ourts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" In re Hertz Glob. Holdings Inc., 905 F.3d 106, 114 (3d Cir. 2018) (quoting Tellabs, 551 U.S. at 323).

Here, Plaintiffs' allegations do not create a "strong inference" of scienter. Plaintiffs allege no facts showing that Cynthia Porter's emails constituted intentional misrepresentations instead of inadvertent ones. When Mrs. Porter sent her emails to Zaldastani, the Company did not sell securities, so it is unlikely Mrs. Porter was attempting to defraud investors. (Doc. No. 56 at 15.) And when the Company did start selling securities, the 2016 License Agreement was provided to Zaldastani in 2020 and made available to the remaining Plaintiffs in the Disclosure Schedule. (Id.) Thus, the facts pled do not support an inference that Defendants were consciously attempting to prevent Plaintiffs from learning the terms of the Agreement.

The difference between intentional and inadvertent conduct is important to pleading scienter under the PSLRA. See, e.g., In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999). True, a defendant's intentional concealment of a material contract term may support an inference of fraudulent intent where the defendant takes steps to prevent investors from discovering the truth. But the allegations here describe no such conduct. The Agreement was disclosed to Zaldastani before the SPA's execution; its existence was disclosed in the SPA's Disclosure Schedule; and the Disclosure Schedule stated that copies were available upon reasonable request. These facts undermine any inference that Defendants consciously or recklessly

sought to hide the Agreement or its terms. Without a strong inference of scienter required by the PSLRA, the Amended Complaint does not adequately plead that Defendants possessed scienter regarding the 2016 License Agreement.

**c. Reasonable Reliance**

Plaintiffs have also failed to adequately allege reasonable reliance, the fourth element of a Rule 10b–5 claim. Plaintiffs argue they invested in the Company based on Zaldastani's representations that the License Agreement's terms were "standard," and would not have invested if they were aware of the actual terms of the 2016 License Agreement. (Doc. No. 49 ¶ 107.) In making these representations to investors, Zaldastani argues he reasonably relied on both Cynthia Porter's emails referring to the 2014 License Agreement as current and Patrick Porter's verbal representations that the Agreement's terms were "standard." (Id. ¶¶ 104, 106.)

In considering whether reliance is reasonable under Section 10(b) and Rule 10b–5, courts in the Third Circuit consider: "(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information." AES Corp. v. Dow Chem. Co., 325 F.3d 174, 178–79 (3d Cir. 2003). "The reliance element of a Section 10(b) claim requires that the plaintiff relied on a defendant's conduct and was injured as a result, despite exercising reasonable diligence." SLF Holdings, LLC v. Uniti Fiber Holdings, Inc., 499 F. Supp. 3d 49, 69 (D. Del. 2020) (citing AES Corp., 325 F.3d at 178).

Here, Plaintiffs' reliance on Zaldastani's descriptions of the License Agreement's terms as "standard" is unreasonable, because investors should be aware of documents provided to them. See Semerenko v. Cendant Corp., 223 F.3d 165, 179 n.8 (3d Cir. 2000) (holding plaintiff's reliance was unreasonable as a matter of law where he knew or had reason to know that the

misrepresentation was in fact false) (citations omitted). Plaintiffs had the opportunity to request a copy of the license agreement under the Disclosure Schedule's terms. (See Doc. No. 49-1, Ex. C) ("This Disclosure Schedule includes brief descriptions or summaries of certain agreements and instruments, copies of which are available upon reasonable request.") And Zaldastani possessed a copy of the 2016 License Agreement prior to the SPA's execution. (Doc. No. 57 at 9.) Plaintiffs could have informed themselves of the Agreement's terms through due diligence. The fact that Plaintiffs chose not to read or pursue the documents does not render their reliance reasonable.

Therefore, Plaintiffs fail to allege they reasonably relied on the Company's representations regarding the terms of the License Agreement.

**d. Loss Causation**

Lastly, Defendants argue Plaintiffs have not sufficiently pled loss causation, the sixth element of a Rule 10b–5 claim. The Third Circuit in McCabe v. Ernst & Young, LLP, 494 F.3d 418 (3d Cir. 2007) provides the following two-pronged test for causation:

> A plaintiff must show both: (1) transaction causation (or reliance), i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security; and (2) loss causation, i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered.

494 F.3d at 425 (internal quotation marks and citations omitted). Regarding the loss causation element, the McCabe Court further explained that even in non-typical 10b–5 actions, as is the case here,[10] "the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." Id. at 426.

In support of their argument, Plaintiffs rely on EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000), which involved a privately negotiated, non-typical securities

[10] The Parties refer to this case as "non-typical" because it involves a non-publicly traded company. (Doc. No. 76 at 6.)

transaction. In EchoCath, the defendant medical research and development company represented to the corporate investor plaintiff that contracts between the company and four prominent corporations to market the company's new products were "imminent." 235 F.3d at 868. Based on the representations, the plaintiff invested $1.4 million. Id. at 869. However, the "imminent" contracts were actually non-existent, with the company expected to run out of operating funds within six months, rendering the plaintiff's investment worthless. Id. The Third Circuit found the plaintiff had adequately pled loss causation, given the connection between the promise of "imminent" contracts and the decline in value of the plaintiff's investment. Id. at 880.

Plaintiffs allege the concealment of Mr. Porter's termination right enabled the Porters' self-dealing, lack of financial controls, nepotism, and poor management, ultimately decreasing the Company's value and harming Plaintiffs' investments. At the hearing held on the Motion to Dismiss on July 27, 2026, counsel for Plaintiffs stated:

> The fact that [Mr. Porter] had a nuclear button that [he] could press, in theory, on the IP rights, gave him the leverage and the rights or the opportunity to take what he wanted from the company. Aside from just having the control of the books and the records and the bank account and the QuickBooks and the checkbook and the company credit card, this gave him enormous leverage. So the actual harms being done to the company, the stealing, the theft, the potential crimes, according to the auditor, this gave him that leverage. It is directly tied.

(Doc. No. 91 at 72:19–73:1–3.)

The Court disagrees with Plaintiffs' characterization of these events as "directly tied." Even when viewing the facts alleged in the Amended Complaint in the light most favorable to them, Plaintiffs demonstrate no causal relationship between the alleged concealment of the termination provision and their losses. While Plaintiffs claim the omission of the termination provision gave the Porters leverage over the Company and facilitated self-dealing, it is unclear how this omission enabled–or even related to–Mr. Porter's alleged misconduct. If Plaintiffs

alleged, for example, that Mr. Porter did in fact terminate the license under the 2016 Agreement and this caused a loss in value, Plaintiffs may meet this element. Here, Plaintiffs make no such argument. And unlike EchoCath, where the company's false statements about nonexistent "imminent" contracts induced the plaintiff to make a worthless investment, Plaintiffs' alleged losses are removed in time and space from Mr. Porter's termination right. Plaintiffs do not claim their monetary losses stemmed from Mr. Porter exercising his termination right, or even threatening to do so. Instead, they allege their losses stem from self-dealing, nepotism, and mismanagement of the company's app. The connection between these events is too attenuated to establish loss causation.

Accordingly, even accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the alleged failure to disclose the 2016 License Agreement cannot support a Rule 10b–5 claim.

### 3. Misstatements Regarding Intellectual Property Ownership

Plaintiffs allege the Company's representations in the SPA that it had developed its own intellectual property for key technology and had all licenses to such technology were false because Mr. Porter misappropriated the Company's technology from a third party. (Doc. No. 49 ¶ 112.) Defendants submit these allegations cannot support a Rule 10b–5 claim for two reasons: (a) the allegations were not made with the requisite specificity; and (b) Plaintiffs have failed to plead loss causation. (Doc. No. 57 at 6, 10.) The Court will address each argument in turn.

#### a. Heightened Pleading Requirements of Rule 9(b) and PSLRA

First, Defendants argue Plaintiffs have not made these allegations with the specificity required of Rule 9(b) and the PSLRA. (Id. at 10.)

As outlined supra, Rule 10b–5 claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. Avaya, Inc., 564 F.3d at 252–53. To

plead falsity, Plaintiffs must identify "each statement alleged to have been misleading" and explain "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA and Rule 9(b) require Plaintiffs to plead the "who, what, when, where and how" of the alleged fraud. Avaya, 564 F.3d at 253.

Plaintiffs' allegations do not meet this heightened pleading standard. Even assuming this misappropriation occurred, it could only render representations in the SPA false if it occurred prior to the execution of the SPA on April 26, 2021. Yet Plaintiffs fail to allege in the Amended Complaint when the alleged misappropriation occurred. (See Doc. No. 49 ¶¶ 112–14.) Without this information, Plaintiffs cannot plead the SPA representations regarding ownership of intellectual property and technology licenses are false.

Accordingly, Plaintiffs have failed to plead with the requisite heightened specificity that the SPA representations regarding the Company's intellectual property were false when made.

**b. Loss Causation**

As explained supra, Plaintiffs attribute their losses to the Porters' self-dealing and mismanagement of the Company. But that is not enough. Loss causation requires demonstrating a causal relationship between the alleged misconduct and the resulting losses. See McCabe, 494 F.3d at 425 (asserting that plaintiffs must show "that the fraudulent misrepresentation or omission actually caused the economic loss suffered."). Here, Plaintiffs fail to demonstrate how the Company's lack of ownership over its intellectual property contributed in any way to the Porters' poor management, self-dealing, or a decline in the Company's value. Therefore, Plaintiffs have not adequately pled loss causation.

At the hearing held on the Motions to Dismiss on July 27, 2026, Plaintiffs' counsel argued that the Company does not have all the rights to its technology and could be sued at any time. However, the Company has no duty to disclose speculative future litigation risks. See SLF

Holdings, LLC, 499 F. Supp. 3d at n.6 ("There is no duty to disclose specific litigation risks that were not substantially certain to occur.") (quotations and citations omitted). Furthermore, Plaintiffs have not alleged that any actual threatened or pending litigation has resulted from the alleged misappropriation of technology.

Therefore, even accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the alleged failure to disclose the misappropriation of the Company's intellectual property cannot support a Rule 10b–5 claim.

**4. Omission of Porters' Bankruptcy**

Plaintiffs allege the Porters fraudulently concealed their previous bankruptcy, despite representations in the SPA that none of the Company's employees had previously filed for bankruptcy. (Doc. No. 49 ¶¶ 138–39.) Defendants argue that the failure to disclose the Porters' prior bankruptcy cannot support a Rule 10b–5 claim for two reasons: (a) Zaldastani cannot establish reasonable reliance; and (b) Plaintiffs have failed to plead loss causation. (Doc. No. 57 at 10–12.) The Court will address each of Defendants' arguments in turn.

**a. Reasonable Reliance**

First, Defendants assert the securities fraud claim should be dismissed as to Zaldastani because he could not have reasonably relied on the SPA's representation regarding the Porters' prior bankruptcy. The relevant portion of the SPA states: "[t]o the Company's knowledge, none of the Key Employees or directors of the Company has been (a) subject to voluntary or involuntary petition under the federal bankruptcy laws. . . ." (Doc. No. 49 ¶ 139, Ex. I at 2.15(f).) The SPA specifically defines "knowledge" as:

> (g) "Knowledge" including the phrase "to the Company's knowledge" shall mean the actual knowledge after reasonable investigation of Nicholas Zaldastani and Patrick K. Porter, Ph.D.

(Id. at 1.6(g).) Because the definition of "knowledge" includes the knowledge of Zaldastani "after reasonable investigation," Defendants argue the SPA's representation regarding bankruptcy could only be false if Zaldastani himself had knowledge of the prior bankruptcy. (Doc. No. 57 at 11.) In other words, Zaldastani's argument contradicts itself: For the SPA representation to be false, Zaldastani must have had actual knowledge of the bankruptcy; yet to demonstrate "reasonable reliance" under Rule 10b–5, Zaldastani must lack such knowledge. (See id.)

This Court agrees that Zaldastani could not have reasonably relied on the SPA representation. A simple public record check, or the "reasonable investigation" the SPA definition contemplates, would have revealed to Zaldastani the previous Chapter 7 bankruptcy of the Porters. Furthermore, as CEO of the Company, Zaldastani had a greater interest in uncovering the financial status of its constituents. Therefore, Zaldastani fails to allege that he reasonably relied on the alleged misrepresentations regarding the Porters' bankruptcy. [11]

**b. Loss Causation**

Second, even assuming reasonable reliance was adequately pled, Plaintiffs have not sufficiently alleged a causal connection between the Porters' prior bankruptcy and their claimed losses. In the Amended Complaint, Plaintiffs claim the Porters' prior bankruptcy indicates "a history of financial mismanagement" and a likelihood of engaging in "misuse of funds," and that the concealment of this fact enabled the self-dealing and misconduct that caused the value of their investments to decline. (Doc. No. 49 ¶ 140.)

These allegations are insufficient to plead loss causation. Plaintiffs fail to demonstrate any cognizable connection between the failure to disclose a bankruptcy and a decline in the value of their investments. See McCabe, 494 F.3d at 425 (asserting plaintiffs must show "that the

[11] While the other Plaintiffs may have reasonably relied on the representations in the SPA regarding the bankruptcy, their claims fail for loss causation, as discussed infra.

fraudulent misrepresentation or omission actually caused the economic loss suffered."). Plaintiffs do not allege, for example, that the Porters engaged in self-dealing to pay off debts from the prior bankruptcy, or that disclosure of the former bankruptcy harmed relationships with Company creditors and resulted in a decline in value. Instead, Plaintiffs merely assert that people who filed for bankruptcy twenty-two years ago have a propensity for financial mismanagement. This speculative reasoning fails to establish a nexus between the former bankruptcy and Plaintiffs' losses, and therefore does not meet the loss causation requirement.

Therefore, even accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the alleged failure to disclose the Porters' prior bankruptcy cannot support a Rule 10b–5 claim.

**5. Intention to Terminate Zaldastani**

Plaintiffs contend Defendants concealed their intention to terminate Zaldastani, despite investors' reliance on Zaldastani's continued leadership. (Doc. No. 49 ¶ 177.) For example, Plaintiffs claim Dr. Martin only invested "because he believed in Mr. Zaldastani's leadership" and "based upon the representation that Mr. Zaldastani was the CEO." (Id. ¶ 178.) Defendants argue this is insufficient to support a Rule 10b–5 claim because the Company had no duty to disclose its intention to terminate Zaldastani. (Doc. No. 57 at 12.)

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Chiarella v. United States, 445 U.S. 222, 235 (1980). In Chiarella, the Supreme Court held that the defendant's failure to disclose material, nonpublic information was not fraudulent because he had no duty to disclose that information to the persons with whom he traded. Id. at 231–35. The Court explained that a duty to disclose arises from a relationship of trust and confidence and does not arise merely from possession of material, nonpublic information. Id. at 230–35. Likewise, "there is no general duty on the part of a company to provide the public with

all material information." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997). Thus, absent a statutory disclosure requirement or insider trading, an omission is actionable only if it renders a prior statement inaccurate, incomplete, or misleading. United States v. Schiff, 602 F.3d 152, 162 (3d Cir. 2010) (citing Oran v. Stafford, 226 F.3d 275, 285–86 (3d Cir. 2000)).

Here, Plaintiffs do not identify any legal duty requiring the Company to disclose its decision to terminate Zaldastani to Dr. Martin. Nor do Plaintiffs identify any statement made to Dr. Martin that was rendered inaccurate, incomplete, or misleading by the Company's failure to disclose their intentions. Zaldastani was, in fact, the Company's CEO when Dr. Martin purchased the SAFE. (See Doc. No. 49 ¶¶ 177–78.) Plaintiffs do not allege that the Company represented Zaldastani would remain CEO for any particular period, would not be terminated, or that the Company had no plans to terminate him. Because Plaintiffs fail to demonstrate a duty to disclose or a misleading statement regarding Zaldastani's termination, the failure to disclose the Company's intention to terminate Zaldastani cannot support a Rule 10b–5 claim.

Thus, accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Company's alleged omission of its intention to terminate Zaldastani cannot support a Rule 10b–5 claim.

**6. Intention to Raise Series B Financing**

Lastly, Plaintiffs allege Defendants misrepresented their intention to pursue Series B Financing. (Id. ¶ 246.) Defendants argue the Rule 10b–5 claim based on the Series B Financing fails for two reasons. First, Plaintiffs fail to identify or allege with particularity a representation demonstrating an intent to raise Series B Financing. (Doc. No. 57 at 13.) Second, even assuming

the Company made such a representation, Plaintiffs do not plead particularized facts showing the Company had no intention of doing so when the representation was made.[12] (Id.)

As outlined supra, claims under Rule 10b–5 are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Avaya, Inc., 564 F.3d at 252–53. To plead falsity, Plaintiffs must identify "each statement alleged to have been misleading" and explain "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Taken together with Federal Rule of Civil Procedure 9(b), the PSLRA requires Plaintiffs to plead the "who, what, when, where and how" of the alleged fraud. Avaya, 564 F.3d at 253.

These heightened pleading requirements are particularly important here because Plaintiffs' theory concerns a future act. A promise to pursue future conduct is actionable only if, when the promise was made, the defendant had no intention of performing it. See Mellon Bank Corp. v. First Union Real Est. Equity & Mortg. Invs., 951 F.2d 1399, 1410 (3d Cir. 1991). Thus, a plaintiff must (1) identify the alleged promise and (2) plead facts supporting an inference that the defendant did not intend to keep the promise at the time it was made. See id. at 1410–11. Subsequent nonperformance, standing alone, is insufficient to allege fraud. Id. at 1411 ("Statements of intention made at the time of contracting are not fraudulent simply because of a later change of mind.").

Here, Plaintiffs' claims regarding the Company's intention to pursue Series B financing fail for two reasons. First, Plaintiffs fail to identify any specific representation by the Company or its representatives showing an intent to enter into Series B financing. The Amended Complaint states

[12] Defendants also argue every Plaintiff except Dr. Martin lacks standing to bring a claim based on the Company's intention to pursue Series B Financing, as only Dr. Martin is alleged to own a SAFE with the Company. (Doc. No. 57 at 13.) Because the Court finds the pleadings insufficient with respect to all Plaintiffs, it is unnecessary to address this argument.

"[i]nvestors were promised that the Company would convert the SAFEs into Series B preferred stock and that the Company would work diligently to close such a financing." (Doc. No. 49 ¶ 205.) However, it does not identify the speaker of this "promise," the promise's substance, or when or in what circumstances it was made. (See id. ¶¶ 205–08.) Under the heightened pleading requirements of Rule 9(b) and the PSLRA, these allegations are insufficient and vague to support a Rule 10b–5 claim.

Second, Plaintiffs do not plead particularized facts showing the Company lacked an intent to pursue the financing when the alleged promise was made. To the contrary, Plaintiffs allege the Company was pursuing potential Series B leads when Zaldastani was terminated, only days after Dr. Martin purchased his SAFE. (Id. ¶ 205) ("Mr. Zaldastani raised approximately $1 million in SAFEs and was also pursuing multiple potential leads for Series B Preferred Stock financing at the time of his termination.") Nor does the fact that the financing ultimately did not occur establish that the Company lacked an intent to perform when Dr. Martin invested. Subsequent non-performance of a future promise, standing alone, is insufficient to plausibly allege that the promise was false when made. See Mellon Bank, 951 F.2d at 1410–11.

Accordingly, even accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Company's alleged failure to obtain Series-B financing cannot support a Rule 10b–5 claim.

**B. Counts Two Through Ten Will Be Dismissed Because All Claims over Which the Court Had Original Jurisdiction Are Being Dismissed.**

As noted in Section I, supra, Plaintiffs also bring claims under state law.[13] However, because all of Plaintiffs' federal claims are being dismissed and because no independent basis for

[13] These state law claims appear in Counts Two through Ten and include: Common Law Fraud by all Plaintiffs against Defendant BrainTap (Count Two); Negligent Misrepresentation by all Plaintiffs against Defendant BrainTap (Count Three); Breach of Contract by all Plaintiffs

jurisdiction exists for these claims, this Court will decline to exercise jurisdiction over the remaining state law claims.

Under 28 U.S.C. § 1367, a district court may exercise supplemental jurisdiction over state law claims if it has jurisdiction over federal claims and if the state law claims "form part of the same case or controversy" as the federal claims. 28 U.S.C. § 1367(a). But "[w]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Talley v. Wetzel, 15 F.4th 275, 281 (3d Cir. 2021) (quoting Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995)); see also 28 U.S.C. § 1367(c)(3) (authorizing district courts to decline to exercise supplemental jurisdiction over state law claims if the "district court has dismissed all claims over which it has original jurisdiction").

Here, as a matter of judicial economy, convenience, and fairness to the parties, Plaintiffs' state law claims are better suited for adjudication in Delaware state court. See Annulli v. Panikkar, 200 F.3d 189, 203 (3d Cir. 1999) (holding that "comity favor[ed] allowing the state court to hear [the plaintiff's] state law claims" where only pendent state law claims remained after dismissal of all federal claims). First, there is no judicial economy in litigating the state claims here. This case is in its early pleading stages, has not begun discovery, and has not progressed to trial. See, e.g.,

against Defendant BrainTap (Count Four); Breach of Fiduciary Duties by all Plaintiffs except Dr. Martin against the Porters (Count Five); Misappropriation of Corporate Assets by all Plaintiffs except Dr. Martin against the Porters (Count Six); Unjust Enrichment by all Plaintiffs except Dr. Martin against the Porters (Count Seven); Breach of Contract by Zaldastani against the Porters (Count Eight); Breach of the Covenant of Good Faith and Fair Dealing by Zaldastani against the Porters (Count Nine); and Unjust Enrichment by Zaldastani against the Porters (Count Ten). (Doc. No. 49.)

Jones v. Twp. of Middletown, No. 11-564, 2011 WL 3157143, at *7 (E.D. Pa. July 26, 2011). Second, it is not inconvenient for the parties to litigate in state court. In fact, the Company's charter requires adjudication of some claims in Delaware Chancery Court, indicating litigation in state court is foreseeable to the parties. (Doc. No. 56 at 4.) Third, no unfairness would result to Plaintiffs from dismissal of these claims, as Plaintiffs assert the statute of limitations has not expired on them.[14] (See Doc. No. 77 at 17–18.) Because the Court dismisses these Counts without prejudice, Plaintiffs are permitted to re-file them in state court.

Therefore, because the Court declines to exercise supplemental jurisdiction over Counts Two through Ten, they are dismissed without prejudice.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss (Doc. Nos. 54, 55) the Federal Securities Fraud claim (Count One) will be granted. Because that is the only claim giving this

---

[14] The parties have litigated whether the statute of limitations has expired on Plaintiffs' state law fraud and negligent misrepresentation claims. (Doc. Nos. 56 at 17–18, 77 at 17–18.) Delaware law imposes a three-year statute of limitations for negligent misrepresentation and fraud claims. Del. Code Ann. tit. 10, § 8106 (2026). Regarding the statute of limitations, Defendants argue that the state-law fraud and negligent misrepresentation claims are time-barred under Delaware law. (Doc. No. 56 at 17–18.) Plaintiffs argue Delaware law tolls such claims where the facts are "fraudulently concealed or inherently unknowable." (Doc. No. 77 at 18.)

The Court need not decide whether Delaware law tolls such claims here. Assuming the claims are time-barred, as Defendants argue, the statute of limitations would have already run by the time Plaintiffs filed their initial complaint in this Court on December 16, 2024, rendering the issue moot. Alternatively, assuming the claims are not time-barred, as Plaintiffs argue, Plaintiffs have sufficient time to re-file in state court before the statute of limitations expires. In fact, Plaintiffs benefit from Section 1367(d), which further tolls the statute of limitations for 30 days on claims dismissed pursuant to Section 1367. 28 U.S.C. § 1367(d). Therefore, the tolling issue does not implicate the fairness considerations of Section 1367(c).

Court original jurisdiction, this Court will decline to exercise supplemental jurisdiction over Counts Two through Ten and will dismiss them without prejudice. An appropriate Order follows.